**In the Matter of LITTLE & IVES CO., Inc., Bankrupt.**

**No. 65 B 574.**

United States District Court
S. D. New York.

Nov. 30, 1966.

Cravath, Swaine & Moore, New York City, for petitioner, Eugene P. Souther and John A. Lucido, New York City, of counsel.

Schwartz & Duberstein, Brooklyn, N. Y., for trustee, Max Schwartz, Warren C. Schwartz, Brooklyn, N. Y., of counsel.

Weisman, Celler, Allan, Spett & Sheinberg, New York City for Harver Publishing, Inc., Samuel R. Rudey, New York City, of counsel.

## OPINION

COOPER, District Judge.

This is a petition to review the July 6, 1966 order of the referee in bankruptcy authorizing the sale of all the trustee's right, title and interest in the American Oxford Encyclopedia for Home and School.

### The Facts

Little & Ives Co., the bankrupt, and Oxford University Press (hereinafter Oxford) entered into two agreements, one on December 13, 1956, the second on March 13, 1958. The essence of both agreements—with extraordinary emphasis on quality of performance and end product—was that Little & Ives was to adapt and revise the Oxford Junior Encyclopedia to make it suitable for the American market. Oxford retained the right to approve all editorial revisions and the "form, content, type of paper and printing" of each completed volume. Copyrights in the finished product were to be taken out in the name of Oxford. Little & Ives was to select an editor subject to the approval of Oxford. Little & Ives was prohibited from making any public statements or issuing any releases regarding the American editions without the prior consent of Oxford. In addition, Little & Ives agreed to set up a system for policing complaints and to discharge any sales personnel using "methods not approved by Oxford and reasonably believed by Oxford damaging to its reputation and prestige."

Upon completion of the American editions, Little & Ives had the exclusive right (within a specified area) to publish, advertise and sell these editions. Little & Ives was to pay all expenses for revision, publication and sale. The first agreement was to terminate five years after the date of initial publication and

was subject to renewal; the second on the date of expiration of the copyright and also subject to renewal. Little & Ives was to pay Oxford 2½% royalties on each volume sold. Both agreements provided that Little & Ives was required to pay specified minimum royalties and the second agreement provided that Oxford could terminate if royalties did not amount to that minimum.

The second agreement gave Oxford the right to sell the American editions in areas outside of the exclusive sales area allocated to Little & Ives. Either party had the right, with the consent of the other party, to use its original material appearing in the American edition in other publications under its own name.

Of especial significance here is the provision in both agreements that upon termination "all rights in and to the * * * Edition[s] shall belong to Oxford and Little & Ives shall promptly deliver to Oxford, without cost to Oxford, all plates, negatives and other materials used in connection with the publication of [each] * * * Edition." Further, if Little & Ives became insolvent, instituted any bankruptcy proceedings or was adjudicated a bankrupt, Oxford had the option to terminate. It should also be noted that Little & Ives was prohibited from assigning the agreements without the consent of Oxford.

On July 15, 1965 Little & Ives filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. On August 13, 1965 Oxford sent a letter to Little & Ives (a copy was also sent to the referee) terminating the agreements. On February 15, 1966 Little & Ives was adjudicated a bankrupt and the trustee invited offers to purchase whatever interest Little & Ives had under the agreements with Oxford. On July 6, 1966 a hearing was held to consider an offer by Harver Publishing, Inc. (hereinafter Harver). During the hearing Oxford stated its objection to a sale on the ground that the trustee had no interest in the rights or work product of Little & Ives (T. 6–8) and demanded the return of all material that Little & Ives had compiled in preparing to publish the American editions of the encyclopedia. (T. 23). Encyclopedia Britannica, Inc. and Littlefield & Littlefield & Adams then made offers which exceeded the initial offer of Harver. Harver ultimately entered the highest bid, $21,000; the referee overruled Oxford's objections and approved the sale of all:

> " * * * the trustee's right, title and interest, if any, in and to the *American Oxford Encyclopedia for Home and School* including all the material prepared for or in the process of preparation for the publication, manufacturing and/or sale of said work of every description whatsoever * * * subject to the alleged liens if any * * * and subject further to any and all contracts and agreements between Little & Ives Co., Inc. and Oxford University Press;"

The referee stayed the order of sale pending the determination of this petition for review, filed by Oxford on July 15, 1966 and certified by the referee on August 2, 1966.

### Applicable Law

Section 70(a) of the Bankruptcy Act, 11 U.S.C. § 110, provides that the trustee in bankruptcy is

> " * * * vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title * * * (5) [to] property * * * which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered * * * "[1]

1. N.Y.Civil Practice Law and Rules (CPLR) § 5201(b) provides: "A money judgment may be enforced against any property which could be assigned or transferred * * * " See also N.Y. CPLR § 6202. Therefore, in determining whether the trustee acquired any interest in the property under consideration we need only consider whether the bankrupt could have "transferred" that property prior to bankruptcy.

The trustee may sell with the approval of the court whatever interest of the bankrupt has passed to him by operation of law. § 70(f) Bankruptcy Act, 11 U.S.C. § 110(f). See 4 Colliers, Bankruptcy § 70.97[5]. If the trustee has possession of property that the bankrupt did not have title to, or could not have transferred, the trustee can not include that property in the assets of the bankrupt's estate and can not sell that property. See In re American Boiler Works, 220 F.2d 319 (3d Cir. 1955); In re Gravure Paper & Board Corp., 234 F.2d 928 (3d Cir. 1956); In re Michigan Motor Specialities Co., 288 Fed. 377 (E.D.Mich. 1923); In re Miners Mills Coal Min. Co., 30 F.Supp. 597 (N.D.Pa.1939); In re Caponigri, 210 Fed. 897 (2d Cir. 1914); Hewit v. Berlin Machine Works, 194 U.S. 296, 24 S.Ct. 690, 48 L.Ed. 986 (1904); 4 Colliers, Bankruptcy § 70.32.

This principle is clearly set forth in the case of In re Michigan Motor Specialities Co., supra, where the petitioner agreed to grant to Michigan Motor Specialties Co. (hereinafter the Motor Co.) the exclusive right to manufacture and sell its products. The contract specified that if the Motor Co. went bankrupt all the Motor Co.'s rights under the contract would revert to the petitioner. The Motor Co. became bankrupt, but the trustee continued to operate the business. The petitioner sought an order declaring the contract terminated as of the date of the adjudication in bankruptcy, and a further order that the trustee discontinue manufacturing and pay the petitioner the amount earned after the contract was terminated. The court held that the contract terminated by its own terms, the trustee acquired no interest in the contract; the petitioner was upheld.

We hold in the instant case, for the reasons set forth below, that the trustee acquired no interest in the contract rights of the bankrupt or in the material compiled by the bankrupt in the exercise of its contractual rights with Oxford.

We find inapplicable those cases that have upheld the trustee's sale upon a finding that the bankrupt had some interest in the property to be sold. See In re Miltones, Inc., 279 Fed. 105 (2d Cir. 1922); Schmidt v. Ryon, 281 Fed. 790 (3d Cir. 1922); In re Frasin, 201 Fed. 343 (2d Cir. 1912); In re Gutterson, 136 Fed. 698 (D.Mass.1905). The courts were solely and properly concerned with securing the greatest benefit to the creditors by closing out the estate as soon as possible and relieving the estate of the burden of litigating a claim. It made no difference whether the claimant asserted his interest against the trustee or against the purchaser; or whether the purchaser had temporary possession of the property pending litigation.

In the case before us, however, by applying the doctrine, "There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Bank of Marin v. England, 87 S.Ct. 274, 277 (1966), we find the equities demand that Oxford's interests be determined before the property is turned over to the purchaser, Harver. If all the material compiled for publication by Little & Ives were released and Oxford were forced to assert its rights against a third party, there would be a substantial threat that the latter may copy and use that protected material for its own purposes. Oxford should not be forced to accept a Pyrrhic victory. It is true that Oxford would have the copyright to all the preparatory material, but this provides little protection to Oxford, especially since the material is in unfinished form. Clearly the equities of this case require an immediate determination of Oxford's rights.

■ We hold that the trustee acquired no interest in the contract rights or in the tangible material compiled by Little & Ives in the process of publication. When Oxford exercised its contractual right to terminate and demanded the return of all materials used in publication, it divested the trustee of any interest it may have had as of the date the petition in bankruptcy was filed. The trustee only acquired that interest in the property which the bankrupt had, the property remaining subject to all valid

claims, liens and equities. 4 Colliers, Bankruptcy § 70.04 p. 954.2.

We do not find that Oxford's retention and exercise of this right defrauded the creditors of the bankrupt: none of the parties allege that it had this effect. The tangible items in themselves are of little value. In sharp contrast is the material written upon them. Surely the creditors of Little & Ives did not rely upon insignificant salvage value. The termination provision is unlike the "pocket mortgage" wherein creditors are defrauded by some turnover of assets to an unforeseeable creditor. Furthermore, the "strongarm clause" in § 70(c) of the Bankruptcy Act, 11 U.S.C. § 110(c) would not operate to invalidate the exercise of Oxford's right of termination after the date of filing the bankruptcy petition.

We find most compelling the sound reason which prompts upholding the validity of an expressed and unambiguous termination provision in a contractual relationship such as confronts us here.[2] This provision protects the legitimate interest of Oxford in preventing its copyright and its good name from being pirated by third parties. It was precisely to avert such a happening that Oxford utilized every possible means to protect its interests and protect its good name. In these circumstances Oxford's interests warrant the protection that it sought to preserve.

We are impressed by the fact that the nature of the relationship between Oxford and Little & Ives was based on trust and confidence; the success of the ultimate publication was predicated upon quality performance and production. Emphasis was placed on the Oxford hallmark; cautionary steps were explicitly underscored to prevent unwarranted invasion thereof. We note particularly the provision that Little & Ives must dismiss any sales personnel whose conduct marred Oxford's prestige and reputation; the provision against contract assignment; and the provision that upon termination all materials used in publication were to revert to Oxford.[3] It is abundantly clear that by exerting to the limit its determination to avoid tarnish upon its reputation, Oxford provided against the foreseeable possibility of any and all materials, relating to ultimate publication under its imprimatur, from falling into the hands of purchasers at the bargain counter who have price but not value.

In essence, Oxford not only placed its trust and confidence but its reputation as well in the hands of Little & Ives. Equity is properly called upon to exert protection of an undertaking so sensitive —one wherein all else is secondary to a good name.

Under such a contractual relationship, the trustee does not acquire the bankrupt's rights. This bankrupt had a very valuable contract right—the right to use

2. Termination provisions such as the one before us have been upheld in many cases involving lease and licensing agreements. See In re Michigan Motor Specialties Co., supra; Empress Theatre Co. v. Horton, 266 Fed. 657 (8th Cir. 1920); In re Lindy-Friedman Clothing Co., 285 Fed. 22 (5th Cir. 1922); Urban Properties Corp. v. Benson, 116 F.2d 321 (9th Cir. 1940); In re Frazin, 183 Fed. 28 (2d Cir. 1910); In re Walker, 93 F.2d 281 (2d Cir. 1937); Lichman v. Moore, 131 F.Supp. 434 (D. N.H.1955); Matter of Amer. Releasing Corp., 4 Am.Bankr.R. (n.s.) 74 (S.D.N.Y. 1924); Matter of Artificial Silk Co., 1 Am.Bankr.R. (n.s.) 469 (N.D.Ohio 1921). See also Smith v. Hoboken R. R. Warehouse & S. S. Connecting Co., 328 U.S.

123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). But see In re Burke, 76 F.Supp. 5 (S.D. Cal.1948). The prior law regarding the validity of termination provisions in leases has been codified in § 70(b) of the Bankruptcy Act, 11 U.S.C. § 110(b). See 4 Colliers, Bankruptcy § 70.43(9) in which it is asserted that there is no good reason not to apply the principle of § 70(b) to other executory contracts.

3. The provision in the contracts that all rights accrued prior to termination shall survive is not inconsistent with Oxford's attempt to protect its interests. This provision appears to refer only to the right of a party to collect monies already due and owing.

Oxford's copyrighted material and to publish and sell an encyclopedia bearing Oxford's established name. That contract right was apparently disposed of in the sale by the referee. This was error. See In re D. H. McBride & Co., 132 Fed. 285 (S.D.N.Y.1904); Ford, Bacon & Davis, Inc. v. Holahan, 311 F.2d 901 (5th Cir. 1962); Florance v. Kresge, 93 F.2d 784 (4th Cir. 1938); In re Miller, 101 F.2d 323 (6th Cir. 1939). But see In re Waterson, Berlin & Snyder Co., 36 F.2d 94 (S.D.N.Y.1929), rev'd 48 F.2d 704 (2d Cir. 1931).

 The bankrupt's rights under such a contract are not "transferable" within the meaning of § 70(a) 5 of the Bankruptcy Act, 11 U.S.C. § 110(a) 5, these rights being personal and not assignable under traditional contract law. See Mills Music v. Cromwell Music, 126 F.Supp. 54 (S.D.N.Y.1954); Bancroft v. Scribner, 72 Fed. 988 (9th Cir. 1896); Arkansas Valley Smelting Co. v. Belden Min. Co., 127 U.S. 379, 8 S.Ct. 1308, 32 L.Ed. 246 (1888); Griffith v. Tower Publishing Co., 1 Ch. 21 (1896); Hole v. Bradbury, 12 Ch.D. 886 (1879); Stevens v. Benning, 1 K. & J. 168 (Ch. 1854), aff'd 6 De G.M. & G. 223 (1855). Therefore, the trustee did not acquire the bankrupt's contractual rights to revise, publish, advertise and sell the American editions of the Oxford Junior Encyclopedia, and the trustee could not sell these rights.

For the same reasons, the trustee did not acquire, and could not sell, the tangible materials used to prepare for publication. These tangible materials have insignificant scrap value; their real value lies in the words, research and ideas that are imprinted upon them. They in turn, are only valuable insofar as there is a right to publish them. The record is replete with intimation that Harver wants these materials so as to succeed somehow to the position of Little & Ives as Oxford's American publisher and distributor. Oxford should not be forced to recognize Harver in that capacity. To sanction the sale of the tangible materials might well produce that result; it would defeat our holding that the trustee clearly did not have the power to sell the right to publish.

 Finally, we reject the contention that Oxford should be estopped from asserting its interest. Neither the trustee nor the purchaser, Harver, has relied to its detriment on the position that Oxford has taken. See In re Gravure Paper & Board Corp., supra; In re Minera Mills Coal Min. Co., supra.

Accordingly, the order of sale is reversed. The trustee is ordered to turn over promptly to Oxford the plates, negatives and the work product of Little & Ives compiled in connection with the publication of the American editions of the encyclopedia, together with all other materials in relation thereto. Articles of furniture (desks, filing cabinets, etc.) and similar objects are exempt from the provisions of this order.

Settle order on notice.