### In re COMPASS VAN & STORAGE CORP., Debtor.

**Bankruptcy No. 884–40907–18.**

United States Bankruptcy Court, E.D. New York.

Oct. 23, 1986.

Louis P. Rosenberg, Brooklyn, N.Y., for debtor-defendant.

Harvey Tropp, New York City, for debtor.

Lord, Bissell & Brook, Chicago, Ill., for Allied Van Lines.

## DECISION & ORDER

C. ALBERT PARENTE, Bankruptcy Judge.

Compass Van & Storage Corp. ("Compass"), the debtor, seeks authorization to assume an Agency Contract with Allied Van Lines, Inc. ("Allied") pursuant to 11 U.S.C. § 365. Once assumed, the contract will be continued by Compass, although the equity ownership of Compass will be transferred in accordance with the proposed plan of reorganization. Allied objects to the assumption and assignment of the contract based on 11 U.S.C. § 365(c)(1)(A) contending that the Agency Contract is a personal service contract and therefore exempt from the general rule of Section 365.

STATEMENT OF FACTS

1) Compass Van & Storage Corp. commenced business in 1925 under the ownership of Burton R. Sims.

2) Compass is engaged in the moving and storage business. A part of the business is conducted under the name Allied Van Lines, Inc. pursuant to an Agency Contract with Allied dated April 11, 1978. The record has established that 34 percent of Compass' business is derived from its agency relationship with Allied.

3) Compass filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 1, 1984, and continues in possession and operation of its business under sections 1107 and 1108 of the United States Bankruptcy Code.

4) Compass' proposed plan of reorganization provides, *inter alia*, that the equity interest of Burton Sims, the present stockholder of Compass, be cancelled and new shares of stock be issued to Michael P. Donovan, Jr. ("Donovan") in consideration of Donovan's capital investment in Com-

pass. The proceeds derived from Donovan's investment will enable Compass to fund the plan of reorganization negotiated with the creditors committee.

5) Article X of Allied's by-laws provides that a change of equity ownership of an Agency Contract constitutes a "transfer" of the Agency Contract which may only take place with the consent of Allied's Board of Directors. Allied's by-laws and regulations require that the Directors act within 60 days of the submission of all necessary forms supplied by Allied to the agent, including an Agency Transfer Application, a personal financial statement of the transferee, financial statements of the transferor reflecting current operations and future projections and a transferor's statement. Allied's rules and regulations also contain a provision and procedure applicable if the Agency Contract or control thereof is "involuntarily" transferred by death, *bankruptcy* or otherwise. (Emphasis added.)

6) Pursuant to a prior order of this court, Donovan was authorized to take over the management of Compass and has functioned as the president of Compass for the past two years.

7) Donovan, in compliance with Section 2 of Article X of Allied's by-laws, filed with Allied all required documentation to effectuate the purchase of the stock and transfer thereof in a timely manner. The submitted documentation, which was sworn to by Donovan in testimony before the court, established that Donovan has a personal net worth in excess of $885,000 and has over ten years experience in the moving and storage business encompassing almost every facet of that business.

8) Upon receiving the required documentation from Donovan, Allied retained Equifax Services to conduct an investigation of Donovan's character, reputation, financial resources and business experience including a search of public records, credit history and any possible civil or criminal litigation pending. Equifax submitted a detailed report to Allied. The report confirmed the facts and statement contained in the personal financial statement submitted by Donovan to Allied. The Equifax report further stated "the subject is financially sound and in good standing and future prospects are good."

9) Donovan testified that at the time he assumed control, Compass was on a C.O.D. basis with Allied, a procedure required by Allied for those entities who are in troubled financial condition. Subsequent to Donovan's assumption of management, Compass was removed from C.O.D. status and is currently billed in the customary manner. During Donovan's stewardship of Compass, Allied has not indicated any dissatisfaction whatsoever with his management or the operation of Compass.

10) In addition to Donovan's testimony, Mr. Dowse, the vice-president of Compass who has been employed for two years as comptroller and two years in his present position, testified that prior to Donovan's assumption of control of Compass, Allied constantly complained of Compass' ability to fulfill its obligations under the Agency Contract. After Donovan's assumption of control, Compass is in good standing with Allied and no complaints have been received as to the manner in which Compass conducts its business. Other than Donovan and Dowse, Compass called no further witnesses. Allied for its part elected not to call any witnesses and rested its case upon the conclusion of Compass' case.

11) Despite Equifax' favorable report and the successful operation of Compass for the last two years under Donovan's stewardship, Compass' attorney received notice of Allied's rejection of Donovan by letter on January 22, 1986, stating only that "after careful consideration the Board of Directors denied said application." The bald rejection was received untimely, *i.e.,* more than 34 days after the expiration of the 60 day time line specified in Allied's by-laws as the period in which the Board of Directors must act on an application by a proposed transferee.

12) Compass sought clarification from Allied as to the basis of its rejection of Donovan's application on two subsequent

periods in time. Both inquiries were ignored and remain unanswered.

13) Allied asserts that pursuant to its by-laws, the Board of Directors is empowered to reject the transfer of an equity interest for any reason. Moreover, that the reason or reasons for the Board of Directors actions are unassailable and need not be divulged.

14) Testimony was adduced without rebuttal by Allied that the loss of the Allied Agency Contract would likely render a Chapter 11 plan impossible.

Upon the contention of the parties and fact posture of this case, the issues evolving to be resolved pertain to whether or not the Agency Contract between Compass and Allied is so inured in the norm of the traditional personal service agreement that it renders the subject contract nonassumable and nonassignable. The evidence further focuses upon whether Allied's by-laws, rules and regulations constitute an *ipso facto* termination of the contract.

## DISCUSSION AND FINDINGS

### A. Personal Service Contracts.

Title 11 Section 365(a) of the Bankruptcy Code sets forth the basic power of a trustee to assume or reject executory contracts and unexpired leases. It is axiomatic that a trustee may, subject to approval of the court, assume or reject executory contracts and unexpired leases.

█ The thrust of the legislative intent and the underlying rationale connotes a policy to insulate the trustee from improvident contracts or leases that impose burdensome liabilities upon the debtor estate. Conversely and in furtherance of the legislative purpose, the trustee is vested with the authority to assume favorable contracts that benefit the debtor estate. *In re Mercury Homes Dev. Co.*, 4 B.R.Ct.Dec. (CRR) 837 (N.D.Cal.1978).

Subdivision (c)(1)(A) of Section 365 contains a limitation factor, *i.e.*, it excludes contracts whose impetus is based upon personal services or skills. It provides:

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession or an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties.

The statutory constraint on the assignability of a personal service contract is independent of any language in the contract or lease itself. 2 Collier on Bankr. 15th, ¶ 365.05; H.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6304; S.Rep. No. 989, 95th Cong., 2d Sess. 59, *reprinted in* 1978 U.S.Code & Ad.News 5787, 5845; *Knipe v. Barkdull*, 222 Cal.App.2d 547, 35 Cal.Rptr. 283 (1963).

The party litigants agree that the applicable nonbankruptcy law appertaining in this case is New York State law.

The nonassignability imprint of personal service contracts is firmly established New York law. 6 Am.Jur.2d *Assignments* § 11 (1963). The general rule has been extended to encompass contracts with corporations as well as individuals. *New York Bank Notes Co. v. Hamilton Bank Note Engraving & Printing Co.*, 180 N.Y. 280, 293, 73 N.E. 48, 52 (1905).

Traditionally, trustees have been denied the right to assume or assign personal service contracts. *In re Miller*, 101 F.2d 323 (6th Cir.1939); *Villar & Co. v. Conde*, 30 F.2d 588 (1st Cir.1929). The court in *In re D.H. McBride & Co.*, 132 F. 285, 288 (S.D. N.Y.1904), succinctly articulated the precept as follows: "[R]ights arising out of contracts involving a relation of personal confidence cannot be transferred *in invitum*." *In re D.H. McBride & Co.*, 132 F. 285, 288 (S.D.N.Y.1904) (citing *Arkansas Valley Smelting Co. v. Belden Mining*

*Co.*, 127 U.S. 379, 8 S.Ct. 1308, 32 L.Ed. 246 (1888)).

Corpus Juris Secundum provides the definitive criteria identifying personal service contracts in the language following:

> A contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability forms an exception to the general rule of assignability of contracts, and is not assignable by the party under obligation to make such performance, without the consent of the other party to the contract, ..., or, unless the contract so provides; and this rule is not affected by a statutory provision permitting the assignment of choses in action. Such contracts for the performance of personal services have also been held not to be assignable by the employer, since it is considered contrary to public policy that one person should exercise such control over the power of another to choose for whom he will labor. The mere fact, however, that a contract calls for the performance of labor or service is not sufficient to render it nonassignable, if, from a consideration of the entire contract, it appears that personality is not an essential consideration, and that only a certain object or result is contracted for and not the personal labor or services of the promissor. Whether a contract requires the personal services of the contracting party depends on the intention of the parties as shown by the language and subject matter of the contract viewed in the light of surrounding circumstances.

6A C.J.S. *Assignment* § 32 (1975) (footnotes omitted).

The Restatement (Second) of Contracts demarcates a personal service contract as one where the duty thereunder is so unique that the duty is thereby rendered nondelegable. A nondelegable duty is defined as follows:

> Unless otherwise agreed, a promise requires performance by a particular person only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised.

Restatement (Second) of Contracts § 318(2) (1981).

Personal service contracts synthesize into those consensual agreements of ineluctable genre and distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste. Thus, it is the *sui generis* attributes of a contract that place it in the context of a personal service contract which interdict its assignment and render it nondelegable. 11 U.S.C. § 365(c)(1)(A).

■ Ascertaining whether a contract is personal posits on close distinctions, *e.g.*, the nature and subject matter of the contract, the circumstances of the case placed in juxtaposition with the intention of the parties. *In re Taylor Manufacturing*, 6 B.R. 370 (Bankr.N.D.Ga.1980).

There is a plethora of case authority extant interpretative of the essential criteria which earmark authentic personal service contracts. For example, a contract to paint a picture; a contract between an author and his publisher; an agreement to sing; an agreement to render service as a physician. All fall within the purview of personal service contracts. *Foster v. Callaghan*, 248 F. 944 (S.D.N.Y.1918); *Sackman v. Stephenson*, 11 N.Y.S.2d 69 (N.Y. Sup.Ct.1939); *Larue v. Groezinger*, 84 Cal. 281, 24 P. 42 (1890); *Deaton v. Lawson*, 40 Wash. 486, 82 P. 879 (1905).

Allied seeks to persuade this court that the Agency Contract forged a special relationship between Allied and its agent Compass of personal trust or confidence. Allied's endeavors to classify the subject contract as a personal service contract within the contemplation of Section 365(c)(1)(A) is unpersuasive and lacks factual or legal merit.

The Agency Contract by its terms is not dependent upon any special personal relationship, special knowledge, or unique skill or talent, but rather it typifies and tracks the ordinary consensual agency, franchise, or distributorship agreements, which have

been consistently interpreted by the courts as not within the ambit or proscript of Section 365(c)(1)(A). *In re Bronx-Westchester Corp.*, 20 B.R. 139 (Bankr.S.D.N.Y. 1982); *In re Coors of North Mississippi, Inc.*, 27 B.R. 918 (Bankr.N.D.Miss.1983); *In re Varisco*, 16 B.R. 634 (Bankr.M.D.Fla. 1981); *In re Rovine Corp.*, 6 B.R. 661 (Bankr.W.D.Tenn.1980); *Rossetti v. City of New Britain*, 163 Conn. 283, 291, 303 A.2d 714, 719 (1972); *Des Moines Blue Ribbon Distrib. v. Drewrys, Ltd. U.S.A., Inc.*, 256 Iowa 899, 911, 129 N.W.2d 731, 738 (1964).

The focal consideration and impulse of the Agency Contract in issue is gleaned from the covenants embodied in paragraph 2, subdivisions 2.1 and 2.2. By its clear and specific terms, the contract quantifies as an agreement for the loyal, diligent and efficient performance of labor and service by Compass in strict compliance with Allied's reasonable rules and regulations and to keep and report in the manner prescribed by Allied or any governmental authority complete records and accounts pursuant to its duties and responsibilities thereunder. Thus, the functional business pursuit and intendment of the parties is explicit. The instrument contains no reference of compelling personal service to effectuate the objectives of the agency agreement.

Paragraph 15 of Allied's answer is illuminating. It alleges that the Agency Contract is "analogous to a personal service contract." The law is abundantly clear that Section 365(c)(1)(A) must be narrowly construed. Allied's equivocation and incertitude as to the nature of the contract elicits a negative credibility impact with reference to the *bona fides* and validity of its position.

This court cognizes the fact that competency, financial stability and the integrity of the person at the helm of Compass is of material concern and consequence to Allied. Prudent business practice warrants assurance that the chief operating officer of Compass has the knowledge and expertise in the moving and storage business. On the evidence adduced, Donovan has em-

pirically demonstrated the ability to successfully perform the requisite duties of his office as president of Compass. The record of his performance for the past two years graphically illustrates his operational capabilities, effectiveness and business acumen.

The court has given particular weight to three significant factors in this regard, to wit, *viz.:*

1) Allied's investigative Agency, Equifax, found Donovan to be "financially sound and in good standing and future prospects are good."

2) Allied's tacit approval of Donovan's stewardship of Compass and in recognition of his accomplishments removed Compass from C.O.D. payment policy reserved for agencies in financial distress.

3) The delay in apprising Compass of Allied's rejection of the equity transfer of stock within the time frame prescribed by Allied.

■ The law of bankruptcy finds its genesis in and is umbilically tied to the canons of equity. The often cited *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934), stated: "[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity." The bankruptcy court is a court of equity and applies the principles and rules of equity jurisprudence. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ In light of the above equitable precepts and uncontroverted facts, Allied's dogmatic assertion that the contract is one for personal services and further that a change in the titular or equity ownership equates to a transfer of a personal service contract lacks merit and is contrary to the evidence and weight of authority. Concomitantly, Allied's insistence that its board of directors may reject a transfer of its Agency Contract for any reason and that the exercise of such right is absolute and unassailable, is clearly unreasonable, arbitrary and violative of the principles and rules of equity jurisprudence.

B. *Ipso Facto* Termination.

■ Section 365(e)(1) invalidates *ipso facto* clauses which automatically terminate a contract or lease or permit the non-bankruptcy contracting party to cancel the contract or lease in the event of a filing in bankruptcy.

Allied's rules and regulations (debtor's Exhibit No. 8) contains a bankruptcy termination clause which reads as follows:

When an agency contract or control of such a contract is *involuntarily transferred,* such as through death, *bankruptcy* or otherwise, the transferee shall, within ten business days after demand by Allied for compliance with this rule, notify Allied of the transfer and the circumstances surrounding the transfer. Within thirty days after Allied makes such demand, the transferee shall make a written application for approval in the manner described in paragraph (B). (Emphasis added.)

Allied's contention that it is empowered unilaterally to reject without reason or explanation an application of a transferee without stating cause (Tr. at 24–25), requires that the provision be interpreted as a bankruptcy termination clause which is rendered unenforceable under 11 U.S.C. § 365(e)(1)(A). The cited section constitutes a codification of what bankruptcy courts had been doing on an *ad hoc* basis pursuant to the general equity powers subsequent to the case of *Queens Blvd. Wine & Liquor Corp. v. Blum,* 503 F.2d 202 (2d Cir.1974).

The court therein propounded the concept that a court of equity must look at the interests of all of the parties before it enforces a forfeiture clause. *Queens Blvd. Wine & Liquor Corp. v. Blum,* 503 F.2d at 206. Should the court find that forfeiture will "emasculate" a plan of reorganization, while relief from forfeiture will not prejudice the rights of the nondebtor, then the forfeiture clause will not be enforced. *In re Potagerie,* 1 C.B.C. 98 (Bankr.S.D.N.Y. 1977); *In re Fountainbleau Hotel Corp.,* 515 F.2d 913 (5th Cir.1975); *Queens Blvd. Wine & Liquor Corp. v. Blum,* 503 F.2d

202 (2d Cir.1974); *Weaver v. Hutson,* 459 F.2d 741 (4th Cir.1972). The legislative history attests to the fact that Congress saw the wisdom of this line of reasoning when it included Section 365(e) into the Code. H.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad.News 5963, 6304; S.Rep. No. 989, 95th Cong., 2d Sess. 59, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5845. The section further requires that "the courts be sensitive to the rights of the nondebtor party." H.Rep. No. 595, 95th Cong., 1st Sess. 348 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6304; S.Rep. No. 989, 95th Cong., 2d Sess. 59, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5845.

In the case at bar, Allied as been given ample opportunity to establish that it would be prejudiced by an assumption of the contract by Donovan. The court finds that Allied has failed to produce even a scintilla of evidence to prove that Donovan's assumption of the contract would in any way prejudice its rights. In fact, its own investigative agency reached a contrary conclusion in its report. Furthermore, to uphold Allied's rejection of Donovan is to destroy Compass' chance for a successful reorganization, Tr. at 32, the very outcome which Section 365(e) was designed to prevent.

CONCLUSIONS OF LAW

Premised upon the above findings and the applicable precepts of law and having considered all of the relevant probative and credible evidence, the court concludes as a matter of law:

1) The Agency Contract between Allied and Compass is not a personal service contract under the provisions of Section 365(c)(1)(A) and may be assumed and assigned by Compass pursuant to Section 365(a).

2) Allied's contract provision contains the element of an *ipso facto* termination clause which is statutorily barred and is thereby rendered ineffective and unen-

forceable by virtue of the provision of Section 365(e)(1)(A)(B).

Accordingly, the motion is granted and Compass is authorized to assume the Agency Contract with Allied and may transfer the equity ownership of Compass in consonance with the proposed plan of reorganization.

SETTLE ORDER.