**In re ROOSTER, INC., Debtor.**

**Bankruptcy No. 89–10737F.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 31, 1989.

James M. Matour, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for movant, Pincus Bros., Inc.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

Gary M. Schildhorn, Adelman, Lavine, Gold and Levin, Philadelphia, Pa., for debtor, Rooster, Inc.

Robert A. Kargen, Lesser & Kaplan, Blue Bell, Pa., for Continental Bank, secured creditor.

Paul B. Maschmeyer, Lashner, Victor & Maschmeyer, Philadelphia, Pa., for Creditors' Committee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Pincus Bros., Inc. seeks relief from the automatic stay, which motion is opposed by the debtor and the official committee of unsecured creditors. In essence, at issue is the nature of a licensing agreement between the debtor and Pincus, a corporation that is the "sole and exclusive licensee of the right to use Bill Blass' name and trademark ... in connection with the manufacture and sale" of men's apparel. Ex. P–1, at 1. In particular, the issue raised is whether the licensing agreement constitutes a personal services contract which cannot be assigned or sold by the debtor.

### I.

This chapter 11 debtor-in-possession is in the business of manufacturing and selling men's neckwear. In February, 1987 the debtor entered into a licensing agreement with Pincus, which granted to the debtor an exclusive sublicense to use the Bill Blass trademark on its neckties.[1] This agreement, prepared by attorneys for Bill Blass and for Pincus, is representative of agreements into which Pincus has entered with its fifteen sublicensees. [N.T. 5/1/89 at 4, 6.] In fact, a Pincus senior vice president, Lawrence A. Smith—the managing director of "Bill Blass Menswear"—testified that the agreement under scrutiny is virtually identical to the fifteen current licensing agreements Pincus has with the other sublicensees. [N.T. 4/27/89 at 19; 5/1/89 at 4.] These fifteen parties were all selected by Pincus, with the approval of Bill Blass, to produce various items of men's apparel; each sublicensee pays royalties to Pincus in the average amount of 7% of gross sales of licensed items up to specified amount in gross sales, and a lesser percentage of additional gross sales. [N.T. 4/27/89 at 22–23.] (The licensing agreements also call for minimum royalty payments.)

The clothing produced by these fifteen sublicensees is coordinated by Pincus, which creates a "package" for the entire Bill Blass menswear line. Pincus apparently prepares this "clothing package" for presentation to the sublicensees, which presentation includes the tone and selection of colors for Bill Blass' new line of menswear. After the sublicensees view the clothing package at Pincus and pick up tone and color combinations, they also view the "accent colors and tone" of related sublicensees. [N.T. 4/27/89 at 24–25.] The object of this is to ensure that the sublicensees present in the retail marketplace the same idea as created by Pincus for the line of Bill Blass menswear. [N.T. 4/27/89 at 25, testimony of Smith.]

Upon receiving information about the look to be created, the sublicensees then must choose appropriate patterns for their clothing items. The debtor's job as a necktie manufacturer was to research the "phenomenal libraries of patterns past" that are maintained by silk producers in Italy. From these old files of patterns Rooster selected patterns for the newly-created line, reproducing these patterns with the colors and tone set by Pincus. [N.T. 4/27/89 at 24–25, 28.] The neckties do not

---

1. The agreement carries four signatures, two belonging to the presidents of Pincus and Rooster, and two of Bill Blass, who signed personally and for Bill Blass, Ltd.

go into production until Bill Blass has examined and approved the chosen patterns. Smith testified that Bill Blass acted as an overseer of the actual designs of the neckwear, and that he changed the neckties size, shape and color before the manufacturing process started. [N.T. 4/27/89 at 37.] In practice, both Bill Blass and Pincus reviewed all proposed Bill Blass neckties and gave express approval to the acceptable merchandise. [N.T. 4/27/89 at 42.]

Indeed, under the licensing agreement *sub judice*, Ex. P–1, the debtor is subject to a substantial amount of supervision and control by Bill Blass and Pincus, its licensee. For example, the agreement provides that the debtor

> shall not have the right to use the [Bill Blass] trademark with respect to any item the design and material of which has not been approved by both Bill Blass, Ltd. and [Pincus] in writing, or which has not been designed by Bill Blass, Ltd., nor shall [Rooster] have the right, except with the consent of Bill Blass, Ltd. and [Pincus] to modify or change the design or designated material of any Licensed Items theretofore so approved, or so designed. Minor changes required by manufacturing demands may be made upon oral approval by Bill Blass, Ltd., and [Pincus], provided, however, that such minor changes do not materially affect the overall appearance of the Licensed Item.

Ex. P–1, ¶ 7(a). Further, under the agreement, the debtor is required, at Pincus' request, to submit to Bill Blass and Pincus samples of the neckties the debtor proposes to sell. Should these samples not meet "standards of the highest quality" as determined by those entities, the debtor can be required to discontinue their manufacture or withdraw them from sale. Ex. P–1, ¶ 7(a), (b).

The debtor is required under the agreement to submit for Bill Blass' written approval "any and all labels, press releases, display, printed matter (including but not limited to stationery, invoices and business cards), advertising and promotional material involving the Trademark. . . ." Ex. P–1,

¶ 8(a). This subparagraph also provides that the parties "expressly understood and agreed that the "Bill Blass" label will not be used on any item without the written approval of Bill Blass, Ltd. of the specific items, both as to the design and quality of raw material. . . ." In addition to delimiting the development, manufacture, final product and advertisement by Rooster of Bill Blass neckwear, the agreement provides for the accounting to Pincus of the debtor's sales, and the payment of certain royalties thereon. Ex. P–1, ¶¶ 5 and 6.

The agreement expressly grants to Rooster the exclusive sublicense to use the Bill Blass trademark in distribution and sales "in the United States, its territories and possessions." Ex. P–1, ¶ 4. The agreement is silent as to the retail markets into which the neckties are to be placed; testimony indicated that Pincus decided to grant the neckwear sublicense to the debtor in large part because of the debtor's perceived good judgment in choosing appropriate retailers, ability to sell to these retailers, and, in general, the business acumen of the debtor's management and principals. [N.T. 4/27/89 at 35–36.] *See also* Ex. P–1, ¶ 17.

Evidence was received to the effect that Jerry Meyers, former president of Rooster, approached Pincus and sought the grant of the sublicense. Before granting this sublicense, for which candidates in addition to Rooster were considered, Pincus conducted its customary "extensive investigation" of each candidate, looking at the candidate's financial status, physical plant, key personnel (to see whether they will be "compatible" with other sublicensees and Pincus), existing products, channels of distribution and marketing, and reputation in the industry. [N.T. 4/27/89 at 25–36.] After selecting Rooster as sublicensee-elect, Pincus introduced the debtor to Bill Blass; Blass inspected Rooster's sample merchandise and was requested, by Pincus, to approve this candidate. Blass, of course, did so approve. [N.T. 4/27/89 at 33–34.]

Pincus introduced other testimony regarding the qualifications of its sublicensees, offering Smith's testimony that it at-

tempts to choose manufacturers which possess, *inter alia*, a "taste level" which is in harmony with the fashion sense of Bill Blass, Pincus and other sublicensees, and an industry *persona* which "complements and enhances the status and prestige of Bill Blass' name and trademarks in the marketplace." [N.T. 4/27/89 at 36.]

No written notice of default under the agreement has been provided to the debtor, either before or after its February 24, 1989 bankruptcy filing.[2] Before commencement of the case, however, Rooster apparently arranged a meeting between Pincus and another manufacturer—Parklane—to see if this company would be acceptable as a replacement sublicensee. No agreement was reached. [N.T. 5/1/89 at 30.] Pincus apparently wants three or four companies to make presentations, and it wants the ability to choose the sublicensee from among these candidates.[3] The debtor, on the other hand, is negotiating to sell its rights under the licensing agreement. Richard Aron, chair of the debtor's board of directors, is negotiating with another entity for an assignment of rights; the assignee would pay $25,000.00 annually for five years to the debtor, plus reimburse the debtor for merchandise already on order for the Bill Blass line (including prepayments made in the approximate amount of $44,000.00). With this money Rooster would cure any contract default and sell the agreement to that entity. [N.T. 5/1/89 at 65–66.]

Therefore, implicit in the litigation over the sublicensing agreement (as with most litigation under 11 U.S.C. § 365) is a contest for control and recovery of the economic value of the agreement. Pincus wants control over the identity of the subli-

censee for a number of reasons—including control over the economic value.[4]

## II.

The parties agree that the licensing agreement is an executory contract within the meaning of 11 U.S.C. § 365. *See generally Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36 (3d Cir.1989). Normally, an executory contract may be assumed or rejected by the debtor (subject to application of the appropriate standard).[5] If the contract is properly assumed, the debtor may assign its rights under the contract, contrary contractual language notwithstanding. 11 U.S.C. § 365(f)(1), (2), (3). An exception to this power to assume and assign is found at 11 U.S.C. § 365(c)(1)(A). This exception provides that:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
>> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties.

11 U.S.C. § 365(c)(1)(A).

The words "applicable law" in this subsection refer to "applicable non-bankruptcy law." *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 59 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 5845, 6304. Evidently, the purpose of this

---

**2.** No evidence was presented as to whether the debtor is currently in breach of the contract for failure to pay royalty premiums, although the positions of the parties would make the existence of a default likely.

**3.** Four companies are now, in fact, being considered by Blass: Schoenfeld, Superba, Gitteman Brothers and Parklane. [N.T. 5/1/89 at 39.]

**4.** Pincus, at trial, tried to minimize this aspect of the dispute—at least from its perspective. I accept, in part, its suggestion that economic factors are not its sole motivating force in bringing this motion. However, its concession that it may seek higher minimum royalties from a new sublicensee of its choosing does reflect that economic issues are relevant.

**5.** 11 U.S.C. § 1107(a) grants the trustee's power to the debtor-in-possession.

provision is to prevent the debtor from assigning (over objection) contracts of the sort ordinarily made unassignable by law. *Matter of West Electronics, Inc.*, 852 F.2d 79, 83 (3d Cir.1988); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28 (1st Cir.1984). Here the issue is narrowly framed by the parties: does the licensing agreement constitute a contract for personal services, which applicable Pennsylvania law holds as unassignable? [6] If it is not a personal services contract, there would be no basis on the evidence presented to grant Pincus relief from the stay; rather, Pincus may file a motion to compel the debtor to assume or reject the contract. By so doing, Pincus will force the debtor either to reject the agreement or cure any defaults.[7] If it is a contract for personal services that cannot be sold or assigned by the debtor, I would grant relief from the stay as the debtor concedes that it can no longer fulfill its contractual requirements as sublessee. *In re West Electronics, Inc.*

### III.

The nonassignability imprint of personal service contracts is found, albeit sparingly, in Pennsylvania law.[8] In *Saxe v. Feinstein*, 366 Pa. 473, 476, 77 A.2d 419, 421 (1951) the Supreme Court stated the principle:

> While a party to a contract may assign his rights and benefits thereunder, he may not, unless the contract so provides, assign his liability under the contract to perform duties involving his personal ability, integrity, credit or responsibility.

This recognition of a universally accepted common law doctrine arose in the context of the assignment to a subcontractor of an obligation to demolish a boiler and the resultant damage that occurred when the job was performed negligently. Without much explanation, the Court concluded that this was not a personal service contract, one which drew upon "personal ability, integrity, credit or responsibility." *Id.*[9]

A contract for "personal services" contemplates performance of contracted-for duties involving the exercise of special knowledge, judgment, taste, skill, or ability. These services are not assignable by the party under obligation to perform without the consent of the other contracting party.[10] *Matter of Sentry Data, Inc.*, 87 B.R. 943, 950 (Bankr.N.D.Ill.1988); *In re Compass Van & Storage Corp.*, 65 B.R. 1007 (Bankr.E.D.N.Y.1986). *See generally* Calamari & Perillo, *The Law of Contracts*

---

**6.** A minority of cases have held that § 365(c) was intended to apply only to personal service contracts. *See In re Taylor Mfg., Inc.*, 6 B.R. 370 (Bankr.N.D.Ga.1980) (citing 2 *Collier on Bankruptcy* § 365.05 and the Commission Report, Doc. No. 93–137, 93rd Cong., 1st Sess. 199 (1973)); *In re Fulton Air Service, Inc.*, 34 B.R. 568 (Bankr.N.D.Ga.1983). The Third Circuit adheres to the majority view, however, that § 365(c) is applicable to any contract subject to a legal prohibition against assignment. *Matter of West Electronics, Inc.*, 852 F.2d at 83. Thus, for purposes of § 365(c), the nature of the performance required under the contract must be nondelegable under applicable law, or the nonassignment legally mandated. *See also In re Alltech Plastics, Inc.*, 71 B.R. 686, 688 (Bankr.W.D.Tenn.1987).

**7.** Pincus does not contend that it is entitled to relief from the stay by virtue of any pre- or postpetition default incurred by the debtor. Thus, I need not address whether my holding in *In re DeSantis*, 66 B.R. 998 (Bankr.E.D.Pa.1986) extends beyond leases to executory contracts.

**8.** All parties concede the applicability of Pennsylvania law to this dispute.

**9.** Unfortunately, the Pennsylvania cases extant do not articulate which factors the courts find persuasive in determining whether a given contract is or is not one for personal services. *See e.g.*, *Western Show Co. v. Mix*, 308 Pa. 215, 162 A. 667 (1932) (action for breach of personal services employment contract by motion picture and vaudeville actor); *Gramby v. Cobb*, 282 Pa. Super. 183, 422 A.2d 889 (1980) (boxer's ten-year personal service contract voided on other grounds).

**10.** Underlying the nondelegable nature of these contracts is the notion that courts will refuse to order specific performance where it would be inherently difficult to do so. *Matter of Noonan*, 17 B.R. 793, 798 (Bankr.S.D.N.Y.1982), *citing De Rivafinoli v. Corsetti*, 4 Paige Ch. 263, 270 (N.Y. Ch. 1833) (disagreeing with the adage that "a bird that can sing and will not sing, must be made to sing"). It is also suggested that such compulsion may violate the Thirteenth Amendment's prohibition of involuntary servitude. Calamari & Perillo, *Contracts* § 16–5 at 666 (3d ed. 1987), *citing People v. Lavender*, 48 N.Y.2d 334, 422 N.Y.S.2d 924, 398 N.E.2d 530 (1979).

§§ 18–25 (3d ed.1987); 6A C.J.S. Assignment, § 32 (1975). *Accord* Restatement (Second) of Contracts § 318(2) (1981) ("Unless otherwise agreed, a promise requires performance by a particular person only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised"); U.C.C. § 2–210(1) (same).

Whether a contract is for personal services depends upon the *sui generis* attributes of the intended performance. *Matter of Noonan*, 17 B.R. 793, 798 (Bankr.S.D.N.Y. 1982); *In re Compass Van & Storage Corp*, 65 B.R. at 1011. Contracts to perform "artistically" are clearly of a personal service nature. *See Foster v. Callaghan & Co.*, 248 F. 944 (S.D.N.Y.1918) (contract between author and publisher); *Matter of Noonan* (contract for singer/songwriter to record); *Western Show Co. v. Mix*, 308 Pa. 215, 162 A. 667 (1932) (duty of Tom Mix to accompany a circus tour).[11] *Compare, e.g., Devlin v. Mayor*, 63 N.Y. 8 (1875) (duty to clean streets involves mechanical skills which are tested by objective standards). Certain employment contracts of individuals also create a categorical "personal services" exception, *see In re Miller*, 101 F.2d 323, 324 (6th Cir.1939); *Florance v. Kresge*, 93 F.2d 784, 786–87 (4th Cir.1938). Corporations can also, however, enter into such contracts. *Ford, Bacon & Davis, Inc. v. Holahan*, 311 F.2d 901, 904 (5th Cir. 1962), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963).[12] Generally speaking, nondelegable duties have been determined to be of a personal nature whenever the performance depends upon a special relationship, special knowledge, or a unique skill, upon which the other party is entitled to rely. *In re Alltech Plastics,*

*Inc.*, 71 B.R. 686, 688 (Bankr.W.D.Tenn. 1987). *See, e.g., In re Bronx–Westchester Mack Corp.*, 20 B.R. 139, 143 (Bankr.S.D. N.Y.1982) (distributor agreement); *In re Taylor Mfg., Inc.*, 6 B.R. 370, 372 (Bankr. N.D.Ga.1980) (lease of real property); *Sackman v. Stephenson*, 11 N.Y. S.2d 69 (N.Y.Sup.Ct.1939) (contract between student and correspondence school).

I cannot conclude that the debtor's performance under the licensing agreement draws upon any special personal relationship, knowledge, unique skill or talent.[13] The only actual discretion retained by the debtor in the area of development or manufacture is the choice of patterns to put into production. This activity allows the debtor to travel to Italy to review the catalogues of patterns there maintained by silk manufacturers. Rooster then chooses patterns that fit the design, color, and quality (the "look") already chosen by Bill Blass and Pincus. Thus, Rooster is not involved in creating the actual design of the trademarked neckwear; its artistic input is limited to choosing from established patterns. Pincus' own testimony conceded that "there is nothing new in the clothing business—everybody keeps reinventing the wheel...." [N.T. 9/27/89 at 38, 40.] Thus, Rooster is not involved in the creation of a new or unique product.

The patterns chosen (and combinations created) by Rooster were not automatically adopted by Pincus and Bill Blass as part of the trademarked line, as explained above. The contracted-for review and ability to alter Rooster's intended product, actually and fully exercised by Pincus and Bill Blass, does not bespeak of any "personal ability, integrity, credit or responsibility", *Saxe v. Feinstein*, 366 Pa. at 476, 77 A.2d

---

**11.** As stated in *Taylor v. Palmer*, 31 Cal. 240 (1866), "all painters do not paint portraits like Sir Joshua Reynolds, nor landscapes like Claude Lorraine, nor do all writers write dramas like Shakespeare or fiction like Dickens...."

**12.** It has been suggested that the duty of a corporation is always assignable because a corporation necessarily performs by delegation of duties to individuals, *New England Iron Co. v. Gilbert E.R. Co.*, 91 N.Y. 153, 167 (1883). However, it is possible for a corporation to contract where the basis of the bargain is the personal

performance of individuals within that company, the delegation of which would be ineffective. Calamari & Perillo, *Contracts* § 18–28 at 762 (3d Ed.1987), *citing Emerald Christmas Tree Co. v. Bedortha*, 66 Or.App. 425, 674 P.2d 76 (1984).

**13.** I note that at least one court has held that § 365(c)(1)(A) must be construed narrowly. *In re Compass Van & Storage Corp.*, 65 B.R. at 1012.

419, with regard to Rooster's performance.[14] Instead, I find that this actual control over Rooster's performance removes Rooster's duties from the sphere of personal service and from the ambit of § 365(c)(1)(A). That is, Pincus relied on the exercise of its rights to control the design of trademarked goods, rather than on the "taste level" of Rooster or any of its employees. [N.T. 4/27/89 at 45.][15]

Other indicia of an agreement contemplating personal services by the debtor are lacking as well. There simply are no contractual terms requiring the personal performance of any identified employee for any particular duty. For example, the agreement is silent on the question of who, representing Rooster, was to travel to Italy and choose the patterns that would be put back into circulation. No one is named as the person responsible for selecting the raw fabric; no named individual is responsible for marketing the finished product. Nor does the contract identify the markets into which Blass trademark items may be introduced.

The instant case is distinguishable from *In re Little & Ives Co.*, 262 F.Supp. 719 (S.D.N.Y.1966), a case upon which Pincus relies heavily. There, a contract to revise, publish and sell an encyclopedia was held to be nontransferable by the debtor's trustee to a third party. The court noted that a personal service contract had been created where the contract provided, *inter alia,* that the debtor was required to "dismiss any sales personnel whose conduct marred [the licensor's] prestige and reputation," and where the relationship between those entities "was based on trust and confi-

dence." The court found that the licensor "not only placed its trust and confidence but its reputation as well in the hands of Little & Ives." *Id.,* at 723. Unlike the case *sub judice, Little & Ives* does not suggest that its licensor exercised real control over its sublicensee.

More importantly, in *Little & Ives,* which involved litigation under the former Bankruptcy Act, the contract allowed the licensor to terminate the agreement in the event of Little & Ives' bankruptcy or insolvency. The licensor did so terminate; this termination was upheld by the court:

We find most compelling the sound reason which prompts upholding the validity of an expressed and unambiguous termination provision in a contractual relationship such as confronts us here.... in these circumstances Oxford's interests warrant the protection that it sought to preserve.

*Id.* (footnote omitted.) Of course, this decision predates the current Bankruptcy Code, specifically 11 U.S.C. § 365(b)(2) and (e)(1), which nullifies this type of *ipso facto* clause. *See, e.g., In re Rose,* 21 B.R. 272 (Bankr.D.N.J.1982); *In re Sapolin Paints, Inc.,* 5 B.R. 412 (Bankr.E.D.N.Y.1980).

Pincus vigorously argues that it relied on the personal involvement and discretion of Rooster president Jerry Meyers, and employees Bernstein and Smeikle. [N.T. 5/1/89 at 3–4.] In particular, it asserted that the agreement contemplates that Meyers would make the above decisions. [N.T. 5/1/89 at 20.] However, Pincus conceded that Meyers did not consistently do this work personally. [N.T. 5/1/89 at 19.] Pincus did not consider this a breach. In fact,

---

**14.** I recognize that the right to inspect the proposed trademarked goods and either approve or disapprove of their entry into the marketplace may be necessary for Bill Blass to preserve its right to enforce the trademark. *Haymaker Sports, Inc. v. Turian,* 581 F.2d 257 (C.C.P.A. 1978); *In re Luce Industries, Inc.,* 14 B.R. 529, 530 (S.D.N.Y.1981). *See generally* 1 J. McCarthy, *Trademarks and Unfair Competition* §§ 18:13–21 (2d ed. 1984). Failure to adequately control the goods produced under the mark may result in abandonment of the mark by the licensor. *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir.1959); *E.I. duPont de Nemours & Co. v. Celanese Corp. of America,*

167 F.2d 484, 35 C.C.P.A. 1061 (1948). I find that the contractual control was actually exercised, and that it was not a mere recitation intended to protect the trademark.

**15.** The importance to the movant of this control was made clear by its introduction into evidence of three neckties, one of which had been properly approved by Bill Blass, and two which had not. The unapproved neckwear had surfaced in the retail marketplace. [N.T. 4/27/89 at 54–59.] Rooster was directed, by Smith, to take the unapproved merchandise out of its display. [N.T. 5/18/89 at 38.]

under the licensing agreement it is possible for the entire roster of Rooster employees to change, without creating an event of default. [N.T. 4/27/89 at 15; 5/1/89 at 68. *See generally* Ex. P–1.][16]

I appreciate Pincus' concern that the finished product look "right." Certainly, in the realm of fashion, appearance is a primary concern. However, to the extent that the final product must be finished with workmanlike skill, this task must be considered more mechanical than not. And, because of the extent that Pincus and Bill Blass retain and exercise plenary control over the trademarked product, they do not rely on the personal performance of Rooster. Thus, if they are dissatisfied with the product, they may exert reasonable veto power and prevent the products' being marketed.[17] It is likely, given such power, that any prospective assignee of the debtor would ensure its "compatibility" with the fashion ideas of Pincus and Bill Blass.

An appropriate order shall be entered.

### ORDER

AND NOW, this 31 day of May, 1989, upon consideration of the motion of Pincus Brothers, Inc. for relief from the automatic stay, and for the reasons stated in the accompanying Memorandum Opinion, the motion is DENIED.

---

**16.** The agreement does provide that a change of Rooster's stock ownership constitutes an event of default. Ex. P–1, ¶ 17. What ¶ 17 probably envisioned is a singularity of identity of the principal and the shareholder, which was not the case in this instance. Here, the stock is held by M. Aron, and not by Jerry Meyers. Thus, Meyers' departure does not literally fall within the contractual provision.

**17.** Again, it is the licensor's control over marketing decisions that militates toward the conclusion that the instant sublicensing agreement is not an unassumable personal services contract, even though the sublicensee has no stated contractual prohibitions in marketing Bill Blass neckwear. Clearly, the movant fears that any new sublicensee chosen by Rooster on the basis of its willingness to pay Rooster the highest sum might offer Bill Blass ties to discount stores; it further fears that such a marketing decision could detract from the overall merchandising of Bill Blass products. Whether such marketing discretion alone would transform this licensing agreement into a personal services contract, I need not now decide. To the extent marketing decisions may adversely affect the licensor, it is empowered by the agreement to override those decisions and withdraw the product. Thus, the licensor is not relying solely upon the discretion of the sublicensee.