**BILL CALL FORD, INC., and Mid–Ohio Ford Jeep Eagle, Inc., Plaintiffs–Appellants,**

v.

**FORD MOTOR COMPANY, Defendant–Appellee.**

No. 93–4046.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1994.

Decided Feb. 27, 1995.

Janet I. Stich (argued), Timothy A. Shimko (briefed), Theresa A. Tarchinski, Shimko, King & Stich, Cleveland, OH, for plaintiffs-appellants Bill Call Ford, Inc., Mid–Ohio Ford Jeep Eagle, Inc.

Daniel W. Hammer, Sr., James B. Niehaus (briefed), Thompson, Hine & Flory, Cleveland, OH, John M. Thomas (argued and briefed), Ford Motor Co., Dearborn, MI, for defendant-appellee Ford Motor Co.

Before: JONES, SILER, and GODBOLD *, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

In this case, Plaintiff Bill Call Ford, Inc. ("Call") [1] is appealing the district court's grant of summary judgment to Defendant Ford Motor Company ("Ford") on all eight counts of Call's claim against Ford. Call is also appealing the district court's grant of Ford's Motion to Compel Discovery and the court's award of attorneys' fees and costs related to the motion. Call's claim primarily arose from Call's attempt to sell its Ford franchise dealership to James Graham. We affirm the district court's grant of summary judgment to Ford on all eight counts of Call's claim, and we affirm the district court's grant of Ford's discovery motion and the award of attorneys' fees and costs to Ford.

---

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. In 1983, Call changed its name to Mid–Ohio Ford Jeep Eagle, Inc., but throughout this case, the parties consistently referred to the Plaintiff as Bill Call Ford.

## I.

On October 1, 1980, Call and Ford executed a Ford Sales and Service Agreement ("Agreement") pursuant to which Call operated as a Ford dealer in Mansfield, Ohio. As a Ford dealer, Call submitted warranty reimbursement claims to Ford through Ford's Direct Warranty Entry system. According to this system, Call transmitted to Ford both the scheduled time for the repair, as shown in Ford's Service Labor Time Standards Manual, and Call's approved labor rate. Ford reimbursed Call for the labor by multiplying the scheduled time by Call's approved warranty labor rate.

Sometime after February 1985, Call claims it realized that Ford was not paying Call the same amount for warranty work as Call was receiving for non-warranty work. Although Call was being reimbursed according to the Standards Manual, the amount of time that the manual indicated it would take to complete the repair was allegedly far less than the actual time. Call claims that it complained to Ford service representatives about the problem, and they supposedly responded that they knew the time guides were unfair but there was nothing they could do to remedy the situation. Call admits that it did not file a protest with the Dealer Policy Board (an impartial panel appointed by Ford that reviews actions with respect to dealers), or with the Ohio Motor Vehicle Dealer's Board ("MVDB").

Desiring to sell the dealership as early as 1982, Call eventually found a buyer for the dealership, James Graham. Call and Graham entered into a "Purchase and Sale Agreement and Employment Agreement" ("buy/sell agreement") on February 3, 1989, pursuant to which Call agreed to sell substantially all of its assets to Graham. The buy/sell agreement provided that Call and Graham would use "their best efforts to obtain the transfer of the [Ford] franchise[ ]," and that in the event approval from Ford was not obtained within ninety days either party could terminate the agreement. J.A. at 242–43.

Call did not initially notify Ford of its agreement with Graham. Ford, however, did learn of the buy/sell agreement when Graham telephoned Ron Tillier, Ford's Cleveland District Sales Manager, on February 6, 1989. A copy of the agreement was provided to Ford in a meeting between Graham and Tillier on February 9, 1989. At this meeting, Graham submitted an application to Ford to obtain a Sales and Service Agreement, which would authorize Graham to operate as a Ford dealer in Mansfield.

On February 14, 1989, Ford notified Call by letter that it probably would be unable to approve Graham's application within thirty days because it did not have all of the necessary information. The letter noted that for purposes of section 4517.56(B) of the Ohio Revised Code (requiring franchisor to provide notice of refusal to approve sale or transfer of assets within thirty days), Ford objected to Graham's application. J.A. at 772. At the same time, however, Ford assured Call that "upon receipt of all requested information, we will complete our review and inform you of the status of the application." *Id.* Call claims that Ford had all of the necessary information. Call Br. at 7.

On March 7, 1989, Ford sent Graham a letter stating that his application was not approved because of his history of unsatisfactory car and truck sales performance at another dealership in Zanesville, Ohio. J.A. at 773. The letter also warned Graham that in the opinion of Ford, the buy/sell agreement presented a serious business risk because Graham was paying an inordinate amount of profit to Call. *Id.* Nevertheless, on March 14, 1989, thirty-three days after Graham's application, Tillier notified Graham by telephone that he would recommend approval of Graham's application. In part, however, because of Graham's unsatisfactory performance in Zanesville, Ford attached the following conditions: (1) The sales agreement would be for a two-year initial term; (2) renewal of the agreement would be contingent upon Graham achieving satisfactory sales and market share performance and meeting satisfactory levels of customer satisfaction; and (3) although Graham had stated he was willing to offer the general manager 25% interest in the dealership, Ford wanted the general manager to have the opportunity to acquire 51% interest within a reasonable

time, *e.g.*, five years. This conversation was confirmed by letter on March 17, 1989. J.A. at 777.

·Graham, however, was dissatisfied with the terms, so Call and Graham appealed to the Dealer Policy Board. On May 22, 1989, 102 days after Graham's application, the Dealer Policy Board upheld Tillier's recommendation, but it increased the initial term to four years and modified the criteria for measuring market share performance. Still dissatisfied, Graham and Call filed a protest with the MVDB. On February 5, 1990, Graham and Call, however, withdrew the protest, and Graham accepted the terms that the Dealer Policy Board had offered eight months earlier.

Call wrote to Ford on March 8, 1990, and stated that Call "voluntarily resigns its Ford Sales and Service Agreement." J.A. at 362. Call further stated that it had examined in detail the provisions of the Agreement "dealing with the termination or non-renewal of agreement, termination benefits, [and] obligations upon termination," and that it "does not seek any of the termination benefits specified in the agreement." *Id.* The letter specified that upon Graham's appointment as a replacement dealer "Ford may then accept this resignation." *Id.* Ford accepted Call's resignation and advised Call that their Agreement "terminat[ed] as of May 2, 1990." J.A. at 361.

On February 5, 1991, Call filed a seven-count complaint, later amended to eight counts, against Ford. Count One alleged that Ford breached the Agreement with Call by failing to approve Graham· as the successor franchisee in a timely manner. Count Two alleged that by the same action, Ford had violated its duty of good faith and fair dealing in the performance of the Agreement. Count Three alleged that Ford tortiously, maliciously, and intentionally interfered with the contractual arrangements between Call and Graham. Count Four alleged that the foregoing acts of Ford were willful, wanton, and malicious, thus entitling Call to treble damages. Count Five alleged that the tort, breach of contract, and statutory violations entitled Call to double damages, treble damages, punitive damages, and/or attorneys'

fees in a sum to be determined at trial. Count Six alleged that Ford failed to fairly and adequately compensate Call for warranty services as required by section 4517.52 of the · Ohio Revised Code. Count Seven alleged that by refusing to approve the sale of the franchise to Graham in a timely manner, Ford had violated section 4517.56 and other provisions of chapter 4517 of the Ohio Revised Code. Finally, Count Eight alleged that Ford violated section 4517.56 of the Ohio Revised Code because it placed conditions upon its approval of Graham's purchase· of the franchise that were not in the original Agreement between Ford and Call. In total, Call demanded $2,750,000 in damages, together with anything else the court might find appropriate.

Ford filed three separate motions seeking summary judgment on all eight counts. The district court granted Ford's motions in three exhaustive opinions totalling seventy pages. Ford also filed a motion to compel verified answers to interrogatories and deposition questions, which the court granted. The court also awarded Ford its costs and attorneys' fees in connection with that motion. This appeal followed.

## II. The Grants of Summary Judgment

"We review a district court's grant of summary judgment *de novo.* ... [I]n a motion for summary judgment, 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Russo v. City of Cincinnati,* 953 F.2d 1036, 1041–42 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2519, 91 L.Ed.2d 202 (1986), and citing *Vollrath v. Georgia–Pacific Corp.,* 899 F.2d 533, 534 (6th Cir.), *cert. denied,* 498 U.S. 940, 111 S.Ct. 345, 112 L.Ed.2d 310 (1990)).

██ Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227,

229 (6th Cir.1990). This means that after the opportunity for discovery, if the moving party demonstrates that there is no genuine issue of material fact as to the existence of any element essential to the non-moving party's case, then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once this initial burden is met, it becomes the burden of the non-moving party to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Much of the contention between Call and Ford involves the language in their Agreement. We note that we have considered the relevant provisions of the Agreement, including ¶ F of the Preamble and Standard Provisions 17(b), 18(b), and 24, in connection with Call's claims.

### A. Count One—Breach of Contract.

█ In Count One, Call alleged that Ford breached its Agreement with Call by failing to approve Graham as the successor franchisee in a timely manner. On appeal, Call bases this allegation on both ¶ 17(b)(1) of the Agreement, which specifically states that Ford's consent will "not be unreasonably withheld," and similar language in ¶ F of the Preamble. Call claims that the language regarding "consent" modifies "[a]ny transfer or attempted transfer" in ¶ 17(b)(1), and Call claims it modifies "assignment" in ¶ F. Because Call was allegedly attempting to "transfer" or "assign" its franchise dealership to Graham, Call claims that Ford breached the Agreement by unreasonably withholding its consent to the transfer for fifteen months, February 1989 to May 1990.

The district court disagreed with Call's linguistic analysis. Regarding ¶ 17(b)(1) the court held the following:

The significance of the semi-colons and conjunctions separating the three phrases contained in subparagraph (1) should not and cannot be ignored.... The court firmly believes and here holds that the use of the semicolon in combination with the disjunctive conjunction "or" separates the three clauses in subparagraph (1) and renders them independent of one another. Thus, the admonition that "consent shall not be unreasonably withheld" only applies when there is "any change, however accomplished, without the Company's prior written consent ... in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F." Consequently, the first clause in subparagraph (1), relating to "transfer or attempted transfer" is simply not subject to consent, reasonable or otherwise—such an action on the dealer's part simply warrants termination or non-renewal of the Franchise Agreement.

J.A. at 966–67.

Regarding the use of the "consent" language in ¶ F of the Preamble, the district court noted that consent could not be unreasonably withheld with reference to "such change." J.A. at 965–66. The court said that a plain reading of the language indicated that "such change," as used in the second sentence of ¶ F, could only refer to the "change" in the immediately preceding sentence, i.e., a "change in the said ownership or managerial authority." *See id.* at 966. Indeed, this is the only change specifically identified as a "change" in the entire paragraph. *Id.* Thus, "such change" as used in the last sentence of the same paragraph must have the same meaning and cannot refer to the intervening "assignment" language. *See id.* Moreover, the court decided that this construction was harmonious with the plain reading of ¶ 17(b)(1), which, as previously stated, only prohibits unreasonable withholding of consent to change in the ownership or management "as set forth in paragraph F." The court concluded that at best the reference in ¶ F to "assignment" only permitted assignment with Ford's consent, a consent totally within Ford's discretion. Thus, it could not support a breach of contract claim.

Although we agree with the district court's ¶ 17(b)(1) analysis, we note that the placement of "such change" in the last sentence of ¶ F, after the intervening "assignment" language, is equivocal, leaving some room for Call's interpretation that the antecedent to "such change" does include an "assignment." Because of this ambiguity, Call argues that the meaning of the contractual language must be determined by a jury and not a judge. Call Br. at 26.

Assuming *arguendo*, however, both that Call's interpretation is correct, that under the Agreement Ford could not unreasonably withhold its consent to a dealer's assignment, and that Call was attempting to assign its franchise dealership to Graham, we still find that Call cannot survive Ford's Motion for Summary Judgment on this claim because it offered no evidence that Ford unreasonably withheld its approval of Graham.

Call asserts that Ford unreasonably withheld its approval of the transfer for fifteen months following the signing of the buy/sell agreement between Call and Graham by placing conditions on the transfer to Graham. Yet, the uncontroverted evidence reveals that Ford recommended approval of Graham as early as thirty-three days after Ford received a copy of Call's buy/sell agreement with Graham. Although Ford did include some conditions with its approval of Graham, Ford offered affirmative evidence that these conditions were reasonable in light of Graham's dealership history. In response, Call offered no evidence that these conditions were unreasonable. The Dealer Policy Board approved the proposed agreement with Graham, with slight modifications to the conditions, only 102 days after the buy/sell agreement was signed. Indeed, the ultimate agreement between Ford and Graham was delayed for fifteen months not because Ford unreasonably withheld its approval but because Call and Graham, dissatisfied with Ford's offer, chose to appeal the proposed agreement. In the face of a properly supported motion for summary judgment, Call must do more than rely on unsupported allegations that misappropriate the responsibility for the delay.

### B. Count Two—Breach of Duty of Good Faith.

In Count Two, Call alleged that by failing to timely approve Graham as the successor franchisee, Ford had violated its duty of good faith and fair dealing in the performance of the Agreement. Call claims that Ford's unreasonable delay was coercive because the conditions it placed on the approval of Graham intimidated Call into accepting substantially less money from Graham than was offered originally. Moreover, Call alleges that Ford had an ulterior motive for its delay, it really wanted to place a minority dealer into Call's dealership instead of Graham. Call finds its cause of action in section 4517.59(A) of the Ohio Revised Code, which states that "no franchisor shall . . . [i]n acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise, fail to act in good faith.[2]" Ohio Rev. Code Ann. § 4517.59(A) (Page 1993).

The district court first held that there was no evidence to justify the inference that Ford withheld its consent to Graham's application because Ford wanted Call to sell to a minority dealer. Regarding the alleged "coercive" conditions, the district court held that the Agreement indisputably gave Ford the right to enter into and negotiate the terms of its own contract with successor franchisees, *see* ¶¶ F, 24, and the court did not find any of

---

**2.** As amended in 1987, the Ohio Revised Code defines "Good Faith" as follows:

"Good Faith" means honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade as is defined in division (S) of section 1301.01 of the Revised Code, including but not limited to the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation; provided however,

that recommendation, endorsement, exposition, persuasion, urging, or argument shall not be considered to constitute a lack of good faith. Ohio Rev.Code Ann. § 4517.01(BB) (Page 1993). Coercion as used in this definition means "to compel or attempt to compel by failing to act in good faith or by threat of economic harm, breach of contract, or other adverse consequences." Ohio Rev.Code Ann. § 4517.01(CC) (Page 1993). It does "not mean to argue, urge, recommend, or persuade." *Id.*

Ford's conditions or conduct to be dishonest or contrary to reasonable commercial standards.

We agree with the district court. The Agreement between Ford and Call clearly contemplated Ford's ability to contract with a successor franchisee under its own terms. Under Ohio law, Call cannot complain that Ford violated the duty of good faith simply because Ford exercised its clearly expressed contractual rights. *See Bennco Liquidating Co. v. Ameritrust Co. Nat'l Ass'n,* 86 Ohio App.3d 646, 621 N.E.2d 760, 762. (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank,* 908 F.2d 1351, 1357 (7th Cir.1990)), *jurisdictional motion overruled,* 67 Ohio St.3d 1438, 617 N.E.2d 688 (1993).

Regarding Ford's alleged motivation to sell to a minority dealer, even if we assume that such a motivation could be used as a source of coercion and hence bad faith, we find that Call has not offered probative evidence that indicates that Ford imposed conditions on Graham's approval, thereby delaying his approval, because it desired a minority dealer. On the other hand, Ford offered clear evidence that it imposed conditions solely because of Graham's unsuccessful dealership history. Because Call has offered no evidence to support its contention that Ford violated the duty of good faith under section 4517.59(A), we affirm the district court's grant of summary judgment to Ford on this count.

**C. Count Three—Tortious Interference with Contractual Relationship.**

■  Call claims that Ford tortiously interfered with the buy/sell agreement between Call and Graham when Ford informed Graham that he might be paying too much for the franchise. The district court concluded that Ford was entitled to summary judgment on this issue because Call presented no evidence that Ford's statements transcended the privilege granted to Ford in the plain language of ¶ 24 of the Agreement.

We agree with the district court. The viability of this claim centers on Ford's privilege to tell Graham that he was paying too much for the franchise dealership. *See Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51,

379 N.E.2d 235, 238 (1977); *Bennco,* 621 N.E.2d at 763. The Agreement specifically provides in ¶ 24 that "[i]f, in the opinion of the Company, the price to be paid for [the dealership] assets appears ... to result in an unsatisfactory return on investment [i.e., it is too high], the Company may, without liability to the Dealer [i.e., Call], counsel with such prospective purchaser regarding such opinions." Thus, Ford had a contractual right or privilege, in order to protect its indisputable interests, to tell Graham that he was paying too much for the dealership. Because Call failed to offer any evidence that Ford's privilege did not exist or that Ford transcended its privilege, no genuine issue of fact exists on this cause of action, and the district court's decision is affirmed.

**D. Counts Four and Five— Enhanced Damages.**

In Counts Four and Five, Call did not allege an independent cause of action; it simply restated the previous causes of action and requested enhanced damages under the previously stated claims. Because the district court found the prior counts meritless, it awarded Ford summary judgment on these counts as well. Call merely restates the same language before this court. Accordingly, the district court's decision on Counts Four and Five is affirmed.

**E. Count Six—Violation of Ohio Rev.Code Ann. § 4517.52 (Page 1993).**

■  Count Six of Call's claim alleged that Ford failed to compensate Call for warranty work in accordance with section 4517.52 of the Ohio Revised Code. Section 4517.52, as amended in 1987, requires each franchisor to "compensate each of its franchisees for labor and parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the franchisee to its retail customers for like service and parts for nonwarranty work." Ohio Rev. Code Ann. § 4517.52 (Page 1993). The heart of Call's claim seemed to be that Ford's reimbursement for a given job was unfair because it was based on a standard time for repair that did not adequately reflect the

actual amount of time that it took Call's mechanics to complete a repair. *See* Call Br. at 8–9.

Ford countered, among other reasons, that Call was barred from bringing a claim under section 4517.52 because ¶ 18(b) of the Agreement required Call to appeal to the Dealer Policy Board as a condition precedent to filing any suit, and Call did not appeal to the Dealer Policy Board. The district court agreed that Call's warranty reimbursement claim fell with the language of ¶ 18(b) because Call's Agreement with Ford was "terminated" and because a warranty reimbursement claim involved a "settlement of accounts." Thus, according to ¶ 18(b), Call had to appeal to the Dealer Policy Board within one year after the effective date of the termination before it could file a claim against Ford, and it admittedly failed to do this.

On appeal, Call claims that the court erred because its franchise with Ford was not "terminated" but "transferred" to Graham; thus, the language of ¶ 18(b) was inapplicable. Call Br. at 16. Alternatively, assuming the franchise was terminated, Call claims that the language of ¶ 18(b) should not have been applied to its warranty reimbursement claim because it is not a "settlement of accounts." *Id.* at 17.

Contrary to Call's assertions, we agree with the district court's analysis and conclusion that the Agreement with Ford was "terminated" and that a warranty reimbursement claim involved a "settlement of accounts." Thus, ¶ 18(b) of the Agreement does apply to Call's claim, and the claim is accordingly barred.

### F. Count Seven—Failure to Approve Violated Section 4517.56(B).

In Count Seven, Call contended that Ford's failure to timely approve the sale of the franchise to Graham violated section 4517.56 of the Ohio Revised Code. The only language in section 4517.56 that could support a claim for failure to timely approve a sale is found in section 4517.56(B):

> The franchisor shall provide the franchisee and the prospective transferee with written notice by certified mail of any refusal to approve a sale or transfer of the

business and assets or all the business and assets or a controlling interest in the capital stock of a new motor vehicle dealer *within thirty days of receipt of the written notice advising of the proposed transfer.* The notice shall specify the objective criteria used to evaluate the prospective transferee and the criteria which the transferee failed to meet.

Ohio Rev.Code Ann. § 4517.56(B) (Page 1993) (emphasis added). The district court decided that the plain language of this section barred Call's cause of action. Within thirty days of learning of the buy/sell agreement between Call and Graham, both Call and Graham received a letter from Ford that stated "for the purpose of Section 4517.56 of the Ohio Revised Code, the Company objects to Mr. Graham's application to be the replacement dealer in Mansfield, Ohio." J.A. at 772. Ford received a written notice of the agreement on February 9, 1989, and Ford notified Call and Graham of the objection by letter on February 14, 1989. *Id.* Thus, the evidence revealed that Ford fully complied with the timing requirements of section 4517.56, and the award of summary judgment to Ford on this issue was proper.

### G. Count Eight—Conditions Violated Section 4517.56(F).

In Count Eight, Call claimed that Ford's insistence that Graham comply with franchise terms materially different from those enjoyed under the Agreement between Ford and Call constituted a violation of section 4517.56(F) of the Ohio Revised Code. Ford contended that the application of section 4517.56(F), effective October 22, 1987, to the transaction between Ford and Graham would impair the Agreement between Ford and Call, effective October 1, 1980, and thus, under Ohio law, would be an impermissible retroactive application of the statute.

At the time Ford and Call entered into their Agreement, section 4517.56(F) did not exist. Since its enactment in 1987, it has read as follows:

> No franchisor shall impose any conditions upon approval of a proposed transfer other than the transferee's compliance

with the requirements of the franchise agreement between the franchisor and the transferor.

Ohio Rev.Code Ann. § 4517.56(F) (Page 1993). The district court agreed with Ford that section 4517.56(F) could not be applied to the transaction between Ford and Graham because it would be an impermissible retroactive application of the law, impairing the Agreement between Ford and Call.

■ Under Ohio law, "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." Ohio Rev.Code Ann. § 1.48 (Page 1993). Neither party claims that the Ohio legislature expressly made section 4517.56(F) retroactive; thus, it must be given prospective application only. *See Men–Guer Chrysler–Plymouth, Inc. v. Chrysler Corp.*, 16 F.3d 1220 (6th Cir.) (unpublished) (holding, based on section 1.48, that section 4517.50 cannot be applied retroactively because statute contained no language indicating Ohio legislature intended retroactive application), *cert. denied*, — U.S. —, 115 S.Ct. 60, 130 L.Ed.2d 18 (1994); *Coulter Pontiac, Inc. v. Pontiac Motor Div.*, 4 Ohio App.3d 169, 446 N.E.2d 1128, 1129–31 (1981).

On appeal, Call claims that it did not ask the district court to retroactively apply section 4517.56(F) because the application of the statute to this case would not be retroactive. *See* Call Br. at 11. Alternatively, Call contends that the district court erred when it refused to retroactively apply section 4517.56(F) because the statute is remedial in nature and not substantive. Call Br. at 15.

After reviewing Call's arguments, we are convinced that section 4517.56(F) cannot be applied to transaction between Ford · and Graham because, under Ohio law, it would result in an impermissible retroactive application of the statute. If applied, the statute would surely be more than remedial as it would impair Ford's ability to exercise its vested contractual rights in the Agreement with Call. Thus, we affirm the district court's grant of summary judgment to Ford on Count Eight.

### III. Motion to Compel Discovery/Attorneys' Fees and Costs

In this last issue, Call claims that the district court erred when it granted Ford's Motion to Compel Discovery and awarded Ford its attorneys' fees and costs for the preparation of the motion.

■ In reviewing the district court's decision to compel discovery and award related attorneys' fees, we recognize that the scope of discovery is within the sound discretion of the trial court. *See Criss v. City of Kent*, 867 F.2d 259, 261 (6th Cir.1988); *Toledo Edison Co. v. GA Technologies, Inc.*, 847 F.2d 335, 341 (6th Cir.1988). Thus, decisions of the district court regarding discovery matters are reviewed under the abuse of discretion standard. *Criss*, 867 F.2d at 261. Abuse of discretion means that the appellate court is left with "a definite and firm conviction that the court below committed a clear error of judgment." *Taylor v. United States Parole Comm'n*, 734 F.2d 1152, 1155 (6th Cir.1984) (quoting *Balani v. INS*, 669 F.2d 1157, 1160 (6th Cir.1982)).

Call contends that the district court erred with respect to one interrogatory and one request for production, when it granted Ford's Motion to Compel · Discovery. We have reviewed the district court's analysis on these two discovery items, and we are convinced that the district court did not abuse its discretion when it granted Ford's Motion to Compel.

Based on Federal Rule of Civil Procedure 37(a)(4), the court also awarded Ford attorneys' fees and expenses incurred in preparation of the discovery motion. Call claims that the fees and costs of $4,706.75 were clearly excessive and unreasonable, and Call believes the district court should have allowed it to engage in discovery to determine whether the amount of time that Ford spent was correct. After reviewing Call's contentions, we find that the district court did not abuse its discretion when it awarded attorneys' fees and costs to Ford.

## IV.

Based on the foregoing, we **AFFIRM** the district court's grant of summary judgment to Ford on all eight counts of Call's complaint, and we **AFFIRM** the court's grant of Ford's Motion to Compel Discovery with the award of attorneys' fees and costs.