In re SUNRISE RESTAURANTS, INC. d/b/a Burger King Restaurants # 84, # 86, # 2948, and # 2972, Debtor.

Bankruptcy No. 91–1374–8p1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 28, 1991.

Russell M. Blain, Tampa, Fla., for debtor.

## ORDER ON MOTION FOR AUTHORITY TO SELL RESTAURANT ASSETS FREE AND CLEAR OF LIENS

## ORDER ON MOTION FOR AUTHORITY TO ASSUME AND ASSIGN LEASES

## ORDER ON MOTION FOR AUTHORITY TO ASSUME AND ASSIGN FRANCHISE AGREEMENTS WITH BURGER KING CORPORATION

## ORDER ON MOTION FOR AUTHORITY TO ASSUME AND ASSIGN EQUIPMENT LEASES

ALEXANDER L. PASKAY, Chief Judge.

This is a Chapter 11 reorganization case and the matters under consideration are all interconnected and relate to the attempt of Sunrise Restaurants, Inc., d/b/a Burger King Restaurants # 84, # 86, # 2948, and # 2972 (Debtor), to sell all of its assets outside of the context of a confirmed plan of reorganization. The Motions of the Debtor are supported by NCNB, the primary secured creditor of the Debtor, who will receive a payment of its claim, albeit in a reduced amount, if the sale is approved. All the parties of interest, with the exception of Burger King Corporation (BKC), also support the Motions of the Debtor. BKC is not only the franchisor but is also a landlord of three of the four locations currently used by the Debtor and is also a major unsecured creditor of the Debtor holding a very substantial claim against the Debtor for unpaid royalties and other charges the Debtor is contractually obligated to pay BKC but failed to do so. BKC opposes the Debtor's attempt to liquidate its assets and contends that the franchise agreement between BKC and the Debtor cannot be assumed and assigned by a franchisee according to § 365(c)(1)(A) and § 365(c)(1)(B) of the Bankruptcy Code.

The facts as established at the evidentiary hearing which are relevant and germane are as follows. The Debtor is a corporation which operates four Burger King restaurants pursuant to four separate franchise agreements (Franchise Agreements) with BKC. James D. Harrison (Harrison) is the majority shareholder of the Debtor. On or about November 1, 1987, Harrison purchased the four franchises, with the consent of BKC, from Marlin Food Services, Inc., a corporation controlled by Irving J. and Judith P. Schwartz. The BKC franchise agreements were assigned to Harrison and subsequently to the Debtor. Similarly, the leases on the three locations that are owned by BKC were assigned to the Debtor. The fourth location is owned by Burger King Operating Limited Partnership (BKOLP) and that lease was also assigned to the Debtor.

Harrison is no newcomer to fast food restaurant operations, having already operated 4 BKC franchise operations in Ohio. However, Harrison's operation of the stores the Debtor seeks to sell was less than successful almost from the beginning, and he experienced serious financial difficulties which eventually forced the Debtor

to seek relief from this Court. The operation of the stores continued to deteriorate during the pendency of this Chapter 11 case to the point that in ten days, the Debtor will be without funds to meet the basic operating expenses, including the payroll for more than 100 employees. To salvage the going concern value of the franchise and to keep the doors open, the Debtor commenced negotiations with Mr. Nicholas Papageorgiou, and on April 19, 1991, the Debtor entered into a Purchase and Sell Agreement whereby the Debtor agreed to sell its rights to the BKC franchises and its personal property, including inventory, and also agreed to assign its interest in the leases covering the three locations for $503,000.00 cash to be paid on closing.

On February 4, 1991, the Debtor filed its voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. On or about March 28, 1991, the Debtor filed its Motion for Authority to Sell Assets Free and Clear of Liens (the Motion to Sell), together with the Motion for Authority to assume and Assign Franchise Agreements with BKC, the Motion to Assume and Assign Leases with respect to the three locations leased from BKC, and the Motion to Assume and Assign Lease with respect to the one location leased from BKOLP (the Motions to Assign). In the motions, the Debtor seeks authority to sell its restaurant assets and to assign its franchise agreements and its leases to Nicholas Papageorgiou and William Kyriakakis (the PK Group).

BKOLP has indicated its consent to the proposed sale and assignment of its lease, provided that arrearage be cured. NCNB, the Debtor's secured lender, is owed in excess of $1.2 million, compared to the total purchase price of $503,000. Nonetheless, NCNB has agreed to accept a fraction of its claim which will free sufficient funds to cure the arrearages of BKOLP and BKC and to fund a dividend to unsecured creditors.

It appears that Papageorgiou is currently a holder of a franchise from BKC and operates eight BKC retail establishments in the New England area. Papageorgiou ac-quired the New England operation from a previous franchisee whose operation was about to collapse. Although apparently Papageorgiou made some improvements in the operations and decreased its losses, the New England operation is still in serious financial condition and is in default under the franchise agreement and is indebted to BKC in excess of $180,000. Papageorgiou obtained a letter of credit in favor of BKC, originally issued for 6 months with a provision to roll it over for 18 months; however, the letter of credit expired and was not rolled over. Thus, there is nothing protecting the interest of BKC as it relates to the New England operation of Papageorgiou.

If the sale is approved and the Debtor is permitted to assign these franchises to the PK Group, it is proposed that Papageorgiou will infuse $200,000 as working capital which is also to be used as a backup fund in the event there is a shortfall in the cash flow of the operation. Additionally, Papageorgiou plans to use this money to improve the four locations by establishing outside seating facilities and playgrounds, and improving the accessibility of one of the locations. The purchase price of $503,-000, which is to be paid at closing, is to be acquired by Papageorgiou from a lending institution; however, the loan is dependent upon his ability to obtain an 80% guarantee of the loan from the Small Business Administration (SBA). While it appears that Papageorgiou has applied to the SBA for the guarantee, he has not yet received notification from the SBA that his loan is, in fact, guaranteed.

According to Papageorgiou, if he is permitted to consummate the transaction, he intends to operate these locations independent of the success or failure of his New England operations. However, he concedes that the Florida operations cannot be made viable unless he is able to renegotiate the leases and obtain a reduction in rent of $92,000 for each location in which BKC is involved. There is no hard evidence in this record to warrant the finding that BKC agreed to the reduction of the lease payments. Instead, this Court finds that the contrary is true and the company repre-

sentatives of BKC emphatically denied that such an agreement has been reached.

The contemplated operation by Papageorgiou will be through a corporation of which he will be President, although he intends that the on-site operation be will conducted initially by Mary Ann Musial, a former employee of BKC. It appears that one of the requirements of the franchise agreement is that the location must be operated by an "operating partner." An "operating partner" is defined in the franchise agreement as one who owns 51% of the stock in the corporation, successfully completes extensive training at Burger King University, and assumes the operation which requires full time physical presence of the operating partner and does not permit absentee operation.

Papageorgiou projects a sales increase of 19% over four years in the operations he seeks to purchase. Additionally, he believes he can reduce the food cost and increase the gross profits. According to Papageorgiou, these can be achieved by making external improvements which would generate more customer traffic and by controlling the employee theft and waste, which, according to the Debtor, has been considerable in the past. The BKC representative argues that sales in the Debtor's operations are currently 15% below projections, and that it is extremely unlikely that an operation can generate a 19% increase in sales in four years.

BKC rates the efficiency and success of franchise operations by comparing them to operations run by BKC. BKC expects independent franchises to operate more efficiently than company-operated stores, and thus, BKC rates the independent franchise operators according to how much more efficiently they can operate above the BKC standard. According to the calculations of BKC, the Debtor is currently operating at a rate which is 3.7% better than the rate at which an establishment run by BKC is operated. (BKC Exh. 1). According to Papageorgiou's figures, he projects to be operating at a rate which is 10.5% better than a franchise run by BKC. It should be noted that in his New England operations, Papa-

georgiou operates at a rate which is only 2.4% more favorable than a franchise operated by BKC. (Burger King Exh. 1).

It is the contention of BKC (1) that the Franchise Agreements are non-assignable "personal service" contracts, (2) that "applicable law" excuses BKC from accepting performance from an entity other than the Debtor, or (3) that even if the Franchise Agreements are generally assignable, BKC has not been given adequate assurance of future performance under 11 U.S.C. § 365(f) and the Debtor should therefore be prevented from assigning the franchise agreements and leases to the PK Group.

■ The initial attack on a Debtor's rights to assume and assign these contracts, as noted earlier, is based on § 365(c)(1)(A) which, in essence, provides that the trustee, in this instance the Debtor–In–Possession, may not assume or assign an executory contract if the "applicable law" excuses a party, other than the Debtor, to such contract from accepting performance from or rendering performance to an entity other than the Debtor or Debtor-In-Possession. Whether the contract involved prohibits the assignment of rights or delegation of duties under the contract, the prohibition of assignment under the Code also provides that it is operative if the other party to the contract does not consent to the assumption or assignment.

The term "applicable law" is not defined by the Code, and the legislative history of this Section offers little guidance in interpreting this language appearing in § 365(c)(1)(A) and § 365(c)(1)(B). *Federated Dep't Stores*, 126 B.R. 516, 518 (Bankr. S.D.Oh.1991). *Fulton Air Service*, 34 B.R. 568, 572 (Bankr.N.D.Ga.1983). Several Courts construed § 365(c)(1) to prohibit assignment only where the executory contract is truly personal and is based on a special knowledge, skill or talent. *See In re Terrace Apartments Ltd.*, 107 B.R. 382 (Bankr.N.D.Ga.1989).

This Court had an occasion to consider the application of this Section of the Code which concerns assumptions and assignments of contracts initially in the case of

*In re Varisco,* 16 B.R. 634, 638 (Bankr. M.D.Fla.1981). In *Varisco,* the Debtor was a party to a franchise agreement which granted the Debtor the exclusive rights to market and distribute the franchisor's baked good products within a certain geographic area. This Court held that the franchise agreement was assignable because it was not a personal services contract based on a special trust and confidence or a special relationship between the parties. *Id.* at 638. In support of the conclusion that the franchise agreement involved no "special relationship," this Court pointed out that the Debtor had purchased the franchise from a prior franchisee, and not the franchisor.

As recently as a few months ago, this matter was also presented for this Court's consideration in the case of *In re Fastrax, Inc.,* 129 B.R. 274 (Bankr.M.D.Fla.1991) (not yet generally reported). In *Fastrax,* this Court rejected the interpretation of § 365(c) which provides that the assignability of an executory contract without consent is a condition precedent to right of a Debtor–In–Possession to assume an executory contract. In *Fastrax,* the Court noted that even though § 365(c) speaks in the conjunctive and provides that a debtor may not assume or assign an unexpired executory contract without consent, a sensible construction of this Section permits but one conclusion—that this Section was designed solely to govern the Debtor–In–Possession's ability to assign a contract which it has already assumed.

■ Section 365(c)(1) was designed only to prevent a Debtor–In–Possession from assigning unexpired executory contracts including personal service contracts, which are ordinarily not assignable by law. *In re Rooster,* 100 B.R. 228, 232 (Bankr.E.D.Pa. 1989); *In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir.1984); *In re Compass Van & Storage Corp.,* 65 B.R. 1007 (Bankr. E.D.N.Y.1986).

There is hardly any question that the relationship between parties was nothing more than a strict business transaction to furnish economic gains to both contracting parties. To run a Burger King retail estab-lishment does not require a special knowledge in a conventional sense, that is a special judgment, taste, skill or ability. The entire franchise operation is based on the strict rules and conditions imposed by the contract, and no retail operator is permitted to utilize his own independent culinary skills to cook hamburgers or to serve any other food items which are not generally served in Burger King establishments according to their standard. This being the case, the objection by BKC of the Debtor's right to assume or assign the franchise agreements and other contractual rights is without merit and must be rejected.

■ Notwithstanding, this still leaves for consideration the duty and obligation of the Debtor–In–Possession imposed by the Code. One of the duties imposed by the Code is a condition precedent to the right to assume and is that the assignee of the contract must furnish assurance of the future performance. 11 U.S.C. § 365(f)(2)(B). There is hardly any question that this is a much more difficult issue to resolve because the facts as established at the initial evidentiary hearing leaves some lingering doubt whether the PK Group would be able to perform the obligations of the contracts sought to be assumed. However, in light of the fact that denying the Motion would certainly do nothing but visit drastic economic consequences and doom on the entire estate, the secured parties as well as the unsecured, this Court is satisfied that PK Group should be given an opportunity to salvage these economic units. After all, in the event that PK Group defaults, BKC will be in no worse a position than it is today since it will have its right under the contract without any interference from this Court, and in the interim BKC might very well have an economically viable franchise operation which would certainly enhance the good will and image of the Burger King name.

In light of the fact that PK Group is willing to infuse $200,000 new capital, this Court is of the opinion that the Debtor should be given an opportunity to salvage the going concern value of the business and the PK Group should be given a chance

and opportunity to maintain these economic units which employ more than 200 people. Based on the foregoing it is

ORDERED, ADJUDGED AND DECREED that Motion for Authority to Sell Restaurant Assets Free and Clear of Liens is granted. Further it is

ORDERED, ADJUDGED AND DECREED that the Motion for Authority to Assume and Assign Leases is granted. Further it is

ORDERED, ADJUDGED AND DECREED that the Motion for Authority to Assume and Assign Franchise Agreements With Burger King Corporation is granted. Further it is

ORDERED, ADJUDGED AND DECREED that Motion for Authority to Assume and Assign Equipment Leases is granted.

DONE AND ORDERED.