In re CLAREMONT ACQUISITION COR-
PORATION, INC.; Claremont Ponti-
ac/GMC Truck, Inc.; Claremont Ford,
Inc.; Claremont Cadillac, Inc.; Clare-
mont Isuzu, Inc.; and Claremont Hyun-
dai, Inc., Debtors.

FORD MOTOR COMPANY and General
Motors Corp., Appellants,

v.

CLAREMONT ACQUISITION CORPORA-
TION, INC.; Claremont Pontiac/GMC
Truck, Inc.; Claremont Ford, Inc.;
Claremont Cadillac, Inc.; Claremont
Isuzu, Inc.; and Claremont Hyundai,
Inc.; Cal Worthington and Worthington
Dodge, Inc.; and General Electric Capi-
tal Corporation, Appellees.

Nos. CV 95–3248 MRP, CV 95–3891 MRP.
Bankruptcy Nos. LA 94–52638–KM, LA 94–
52627–KM, LA 94–52635–KM, LA 94–
52637–KM, LA 94–52639–KM and LA 94–
52642–KM.

United States District Court,
C.D. California.

Sept. 7, 1995.

Michael S. Kogan, Arter & Hadden, Los Angeles, CA, for debtors.

Wallace M. Allan, O'Melveny & Myers, Los Angeles, CA, for General Motors Corp.

Kimberly S. Winick, Mayer, Brown & Platt, Los Angeles, CA, Keith A. Langley, Dallas, TX, for Ford Motor Company.

James J. Joseph, Danning, Gill, Diamond & Kollitz, Los Angeles, CA, for Sidney G. (Jack) Head and Louis Frahm, Lessor of Acura Store.

Bruce L. Ishimatsu, Bryan Cave, Los Angeles, CA, for American Isuzu Motors, Inc.

Gregory Bray, Murphy, Weir & Butler, Los Angeles, CA, for G.E. Capital.

Adam H. Bloomenstein, Hyundai Motor America, Fountain Valley, CA, for Hyundai Motor America.

John C. Tobin, Best, Best & Krieger, Riverside, CA, for City of Claremont and City of Claremont Redevelopment Agency.

Gary E. Klausner, Robinson, Diamant, Brill & Klausner, Los Angeles, CA, for Cal Worthington and Worthington Dodge, Inc.

## OPINION

PFAELZER, District Judge.

Ford Motor Company ("Ford") and General Motors Company ("GM") appeal an order of the bankruptcy court compelling GM and Ford to accept assignment of Debtors' franchise agreements to Worthington Dodge, Inc. ("Worthington Dodge") which is owned by Cal Worthington ("Worthington"). The questions presented by these appeals are: (1) whether the bankruptcy court erred in applying California Vehicle Code § 11713.3(e) to the assignment of the automobile franchise agreements; (2) whether the bankruptcy court applied the correct legal standard under Cal.Veh.Code § 11713.3(e); (3) whether the factual record supports the bankruptcy court's determination that GM and Ford's refusal to consent to the assignment to Worthington was unreasonable; and (4) whether the bankruptcy court erred in interpreting § 365(b)(2)(D) of the Bankruptcy Code, 11 U.S.C. § 365(b)(2)(D), as relieving the Debtors from the obligation of curing the default arising from their failure to operate the franchises for more than seven days prior to the bankruptcy filings.[1]

---

1. In addition, Ford appeals the bankruptcy court's decision to overrule numerous of its objections to Worthington's evidence. Ford has not specified the grounds for its appeal. This Court has considered Ford's appeal and affirms the bankruptcy court's evidentiary rulings.

## I.

### BACKGROUND

The Debtors operated Cadillac, Pontiac/GMC Truck, Ford, Isuzu and Hyundai dealerships at the Claremont Auto Center in Claremont, California. On or about November 7, 1994, Debtors ceased operating the automobile dealerships. On November 20, 1994, the Debtors filed individual Voluntary Petitions for Relief under Chapter 11 of the Bankruptcy Code. Each of the Debtors has been operating as a debtor in possession since that time and the individual cases are being jointly administered. On March 31, 1995, the bankruptcy court approved Worthington as purchaser of the Debtors' assets, including the dealer franchises, for $1,700,-000. Applying Cal.Veh.Code § 11713.3(e), which prohibits transfer of automobile franchise agreements without the consent of the manufacturer whose consent may not be unreasonably withheld, the bankruptcy court required the consent of the automobile manufacturers prior to ordering assignment of the franchise agreements. Isuzu, Ford and GM refused to consent to the assignment of the franchise agreements to Worthington. On April 18, 1995, the Debtors sought an order compelling the assignment of the franchises over the objections of the manufacturers. On May 3 and 17, 1995, the bankruptcy court held hearings on Debtors' motion. On June 1, the bankruptcy court entered a Consolidated Order Authorizing Debtors to Assume and Assign Automobile Dealership Franchise Agreements and Consolidated Findings of Fact and Conclusions of Law Regarding Debtors' Motion to Assume and Assign Automobile Dealership Franchise Agreements ("Findings and Conclusions") finding that GM and Ford had been unreasonable in refusing to consent to the assignment.

Ford and GM appeal the order compelling assignment of the franchise agreements. On June 8, 1995, this Court granted Ford and GM's request for an emergency stay pending appeal.

## II.

### STANDARD OF REVIEW

■ This Court reviews the bankruptcy court's interpretation of applicable law *de novo*, and the findings of fact for clear error. *In re Tucker,* 989 F.2d 328, 330 (9th Cir. 1993).

## III.

### DISCUSSION

**A. Applicability of California Vehicle Code Section 11713.3(e)**

■ California law restricts an automobile franchisee's ability to assign the franchise without the consent of the manufacturer.

> It is unlawful and a violation of this code for any manufacturer, manufacturer branch, distributor, distributor branch licensed under this code to do any of the following:
>
> . . . .
>
> (e) To prevent, or attempt to prevent, a dealer from receiving fair and reasonable compensation for the value of the franchised business. *There shall be no transfer or assignment of the dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld.*

Cal. Veh.Code § 11713.3 (emphasis added). The bankruptcy court held that this statute applied to the assignment of Debtors' automobile franchise agreements and inquired into the reasonableness of GM and Ford's refusal to consent to the assignment of the franchises to Worthington. Worthington now argues on appeal that it was error to apply this statute. Worthington contends that § 365(f)(1) of the Bankruptcy Code does not permit courts to look to state laws prohibiting the assignment of executory contracts. Worthington argues that the Court should not inquire whether the refusal to consent was "reasonable" under California law, but should inquire instead whether the proposed assignee has given the manufacturers "adequate assurances of future performance." 11 U.S.C. § 365(f)(2)(B).

The Bankruptcy Code provisions governing the assignment of executory contracts have caused considerable confusion. Section 365(f)(1) provides:

Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease....

Subsection (c), the exception to this assignability rule, provides:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such a contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties....

11 U.S.C. § 365(c)(1)(A).

The First Circuit in *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27 (1st Cir.1984) held that a Rhode Island law which prohibited assignment of automobile franchises without the consent of the manufacturer was "applicable law" excusing the manufacturer from accepting performance from an assignee. GM and Ford argue that *Pioneer Ford* was correctly decided and urge this Court to follow that decision. In *Pioneer Ford*, Justice Breyer read the Bankruptcy Code in a manner which avoids conflict between the two provisions. He interpreted (f)(1) to apply to those state laws which enforce contractual anti-assignment provisions, and (c)(1)(A) to apply to those state laws which prohibit assignment regardless of whether the contract contains an anti-assignment provision.[2] *Id.* at 29. Under this analysis, (f)(1) prohibits the enforcement of contractual anti-assignment provisions in a bankruptcy proceeding, regardless of state laws validating those

provisions. However, (c)(1)(A) requires the bankruptcy court to enforce those state laws which specifically prohibit the assignment of certain types of agreements. *Accord In re CFLC, Inc.*, 174 B.R. 119, 121 (N.D.Cal.1994) ("[S]ubsection (f) operates to delete a nonassignability clause from a contract and render it 'silent' regarding assignment, but subsection 365(c) restores the nonassignability if applicable law holds such 'silent' contracts to be nonassignable"); *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545 (Bankr.N.D.Cal. 1990) (following *Pioneer Ford* and applying Cal. Veh.Code § 11713.3); *In re Nitec Paper Corp.*, 43 B.R. 492, 498 (S.D.N.Y.1984) ("[Subsection (f) ] allows a trustee to assign a contract even when the contract bars such an assignment, and even if 'applicable law' in the state gives legal force to contractual provisions barring assignment. It does not allow a trustee to assign a contract in violation of a specific federal or state statutory mandate forbidding assignment.")

Other courts have been critical of the approach to §§ 365(f)(1) and (c)(1)(A) taken in *Pioneer Ford*. In *In re Magness*, 972 F.2d 689 (6th Cir.1992), the Sixth Circuit found the *Pioneer Ford* statutory construction unpersuasive: "There is simply nothing in the language of § 365(f) which supports the limitation read into it by that court [that (f)(1) applies only to statutes making contractual nonassignment clauses enforceable]." 972 F.2d at 695. The concurring opinion in *Magness* points out that § 365(f) "specifically includes within its scope situations in which the bar to assignment is not contractual but purely a product of the law," and thus should not be read to apply only to state laws enforcing anti-assignment clauses. *Id.* at 699. Faced with this conflict, the *Magness* majority concluded that "[n]either *Pioneer Ford* nor any other decision to date provides a defensible explication of the parameters of the § 365(c) exception." *Id.* at 695.

---

2. As a matter of logic, however, we see no conflict, for (c)(1)(A) refers to state laws that prohibit assignment "whether or not" the contract is silent, while (f)(1) contains no such limitation. Apparently (f)(1) includes state laws that prohibit assignment only when the contract *is not* silent about assignment; that is to say, state laws that enforce contract provisions prohibiting assignment. *See* 1 Norton, *Bankruptcy Law and Practice*, § 23.14. These state laws are to be ignored. The section specifically excepts (c)(1)(A)'s state laws that forbid assignment even when the contract *is* silent; they are to be heeded. 729 F.2d at 29.

Both opinions in *Magness* resolve the conflict between the two subsections by narrowing the scope of (c)(1), as opposed to the *Pioneer Ford* court's narrowing of (f)(1).

> We must read sections 365(f) and (c) together. At first, it might seem that they are not consistent, but a careful parsing of the provisions suggests that § 365(f) contains the broad rule and § 365(c) contains a carefully crafted exception to the broad rule made necessary by general principles of the common law and our constitutions.
>
> Subsection (f) states that although the contract or applicable law prohibits assignment, these provisions do not diminish the broad power to assume and assign executory contracts granted the trustee by § 365(a). In other words, a general prohibition against the assignment of executory contracts, i.e., by contract or "applicable law," is ineffective against the trustee.... However, subsection (f), by specific reference to subsection (c), allows one specific circumstance in which the power of the trustee may be diminished. Subsection (c) states that if the attempted reassignment by the trustee will impact upon the rights of a non-debtor third party, then any applicable law protecting the right of such party to refuse to accept from or render performance to an assignee will prohibit assignment by the trustee. While subsections (f) and (c) appear contradictory by referring to "applicable law" and commanding opposite results, a careful reading reveals that each subsection recognizes an "applicable law" of markedly different scope.

*Id.* Other than citing to the concurring opinion and suggesting that "the applicable law of controlling significance to the solution of this problem addresses the interests of the non-debtor third parties, rather than law relating to general prohibitions or restrictions on assignment of executory contracts covered by § 365(f)," *id.*, the Sixth Circuit offers no further explanation of the scope of "applicable law" under subsection (c).

The concurring opinion in *Magness* expresses the following view on the interplay between subsections (c)(1) and (f)(1) as follows:

> I need not resolve the problem, however, nor fully articulate my perception that the two sections refer to completely different legal concerns, with 365(f) covering "applicable law" (and contractual clauses) prohibiting or restricting assignments as such, and 365(c) embracing legal excuses for refusing to render or accept performance, regardless of the contract's status as "assignable" according to state law or its own terms.

972 F.2d at 699. Thus, both the majority and the concurring opinions appear to interpret "applicable law" in 365(c) as limited to those situations where the common law would permit the non-debtor party from refusing to accept performance from a proposed assignee, even in the absence of an express anti-assignment rule. *In re Antonelli,* 148 B.R. 443, 447 (D.Md.1992).[3]

The Eleventh Circuit in *In re James Cable,* 27 F.3d 534 (11th Cir.1994) adopted an approach similar to that taken by the *Magness* court and which Worthington urges this Court to follow:

> In determining what constitutes applicable law within the meaning of § 365(c)(1), § 365(c) should not be read in a vacuum. Rather, we must read it together with the other subsections in § 365....
>
> ....
>
> ... Subsection (f) states that 'applicable law' prohibiting an assignment of an executory contract does not bar assignment of an executory contract by a trustee (or a debtor in possession). Thus, the 'applicable law' to which subsection (c) refers must mean 'applicable law' other than general prohibitions barring assignment ... Subsection (c), as applied to this case, therefore, asks whether Tennessee law excused the City from accepting performance under the cable franchise agreement from a third party....

3. The court in *Antonelli* recognized that the limitation on "applicable law" in 365(c) is "somewhat facile," but felt that it "opens the way to a thoughtful and just resolution of the issues." 148 B.R. at 448.

A general prohibition against assignment does not excuse the City from accepting performance from a third party within the meaning of (c)(1). In order to be excused from accepting performance, the City would need to point to applicable law such as a Tennessee law that renders performance under the cable franchise agreement non-delegable.

27 F.3d at 538.

Worthington argues that

> the Eleventh Circuit essentially found that a state statute which prohibits an assignment of a specific type of executory contract is not 'applicable law' which 'excuses' performance within the context of 365(c)(1), but that such a statute is governed by 365(f)(1). In order for the narrow exception carved out by (c)(1) to apply, there must be applicable law which makes the duties to be performed under the contract non-delegable.

From the language of the *James Cable* opinion, however, it is not clear that the court viewed the exception in (c)(1) as narrowly as Worthington suggests. The court in *James Cable* held that a municipal ordinance which granted a cable television franchise and restricted its assignment was not "applicable law." 27 F.3d 534. The court expressly noted that no other Tennessee law prohibited assignment of cable franchises. *Id.* at 538. The municipal ordinance at issue in that case seems more closely analogous to a contractual provision barring assignment than to a state law prohibiting assignment of a particular type of contract. Applying the analysis of the case to a statute like Cal.Veh.Code § 11713.3(e) which prohibits assignment of a class of contracts, however, it is not clear that the decision in *James Cable* suggests, as Worthington argues, that this statute is not "applicable law" for the purposes of (c)(1). Section 11713.3(e) is not a "general prohibition against assignment" and makes the

duties of an automobile franchisee "non-delegable," if the manufacturer reasonably refuses to consent to the proposed franchisee.

Worthington attempts to define the exception (c)(1) as applying only in those situations where the contract is "nonassignable as a matter of ordinary contract law" or where the contract involves "inherently non-delegable duties." These formulations are very similar to the widely rejected interpretation of (c)(1) as applying only to personal services contracts and suffer from the same defects. The statute itself contains no language limiting its application to "inherently nonassignable contracts" or "nondelegable duties." *Magness,* 972 F.2d at 699. *See also Pioneer Ford,* 729 F.2d at 28–29; *In re Midway Airlines, Inc.,* 6 F.3d 492, 495 (7th Cir.1993); *In re Braniff Airways, Inc.,* 700 F.2d 935, 943 (5th Cir.1983). In addition, the question of whether a particular duty is "personal" is a difficult one, which is simplified by looking to state law, including state statutory law, making certain types of contracts nonassignable.[4] Finally, the formulations suggested by Worthington render the exception in (c)(1) too narrow to be meaningful.

Recognizing the limitations of the approaches taken by both the *Pioneer Ford* and *Magness* courts, one commentator has suggested that Congress created an irreconcilable conflict in the statute by using the terms "applicable law" both in the rule, subsection (f)(1), and the exception to the rule, subsection (c)(1), and suggests that

> [p]erhaps the best approach is to recognize that the apparent conflict likely results from an effort by Congress to accommodate competing interests and that the best approach balances fairness to the nondebtor party with maximizing the bankruptcy estate.

1 *Norton Bankruptcy Law and Practice 2d* § 39:32.[5] In this case, the balance points toward the application of Cal.Veh.Code

---

4. *See In re Headquarters Dodge,* 13 F.3d 674, 683 (3d Cir.1993) (remanding for determination whether automobile franchise was a "personal services" contract under Michigan law.)

5. The court in *In re Catron,* 158 B.R. 629 (E.D.Va.1993) dealt with conflict between (f)(1) and (c)(1) by simply disregarding the language

"applicable law" in subsection (f)(1), producing a result identical to that in *Pioneer Ford:* (f)(1) refers to contractual anti-assignment clauses and state laws which make them enforceable and (c)(1) refers to state and federal laws which make nonassignable even contracts which are silent on the issue of assignment.

§ 11713.3 and excusing the manufacturers from accepting performance from an assignee, so long as this refusal is reasonable. While maximization of the estate is clearly a primary goal of the Bankruptcy Code, § 365(c) recognizes that some executory contracts will not be assignable. In this particular case, virtually all of the proceeds from the sale will go to GE Capital, the Debtors' secured creditor. GE Capital, which has already been granted relief from the automatic stay, stated on the record in the bankruptcy court that the amount it would receive as a result of the sale is only marginally greater than what it would receive by foreclosing on its collateral. In the amended order authorizing the sale of the dealerships, the total allocated to all of the franchises is only $100,-000 of the $1.7 million sale price. Fairness to the manufacturers requires allowing them some measure of control over the assignment of their franchise agreements. In weighing this balance of fairness to the manufacturer and the interests of the estate, it is also significant that the California prohibition on assignment is not absolute. Manufacturers are only excused from accepting performance from assignees when their refusal is "reasonable."

■ Given the contradictory language in subsections (f)(1) and (c)(1), no interpretation will be entirely satisfactory. The rule and the exception cannot be equivalent. The meaning of "applicable law" in one of the two subsections must be interpreted in such a way as to make sense of the statutory provision and this Court is persuaded that the *Pioneer Ford* decision strikes the proper balance. By interpreting (f)(1) to apply to state laws that validate contractual anti-assignment provisions, this subsection prohibits parties from relying on contractual anti-assignment provisions, regardless of state law. However, where federal or state statutory or common law prohibits assignment of certain types of agreements, even when these agreements are silent on the issue of assignment, it is appropriate to apply these laws in a bankruptcy proceeding.[6]

Worthington also argues that subsection (c)(1) does not apply because the California Vehicle Code does not "excuse" the manufacturers from accepting performance from someone other than the initial franchisee, but is rather a law which "prohibits, restricts or conditions" assignment, making subsection (f)(1) applicable. Worthington cites only one case relying on this distinction in interpreting subsections (f)(1) and (c)(1), *Matter of Fulton Air Service, Inc.*, 34 B.R. 568, 572 (Bankr.N.D.Ga.1983). This distinction is not particularly helpful, nor is it clear how it would be applied in this case. Worthington offers no convincing argument why Cal. Veh. Code § 11713.3(e) is not properly seen as "excusing" a manufacturer from accepting performance from an assignee, so long as the refusal to consent to the assignment is reasonable.

**B. Standard for "Reasonable" Refusal to Consent Under Cal. Veh.Code § 11713.3(e)**

■ There are no published decisions by a California state court interpreting Cal. Veh. Code § 11713.3(e). The only published opinion discussing the proper standard to apply under this statute is *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545 (Bankr.N.D.Cal. 1990). The court in that case looked to the law governing assignment of leases for guidance in selecting a standard of "reasonableness." The court reviewed several standards which have been employed in defining reasonableness in that context and concluded:

Although the standards set forth in the authorities quoted above differ from one

---

**6.** The other cases cited by Worthington are either inconsistent with the *Pioneer Ford* case or are factually distinguishable. In *In re Wills Motors, Inc.*, 133 B.R. 303 (Bankr.S.D.N.Y.1991), the court found that the manufacturer had no reasonable basis for its decision to refuse to consent to the transfer of the franchise agreement. In *In re Tom Stimus Chrysler–Plymouth, Inc.*, 134 B.R. 676 (Bankr.M.D.Fla.1991), the court incorrectly limited the scope of § 365(c)(1) to personal service contracts. The other cases cited involved no statutory prohibition on assignment. *In re Sunrise Restaurants, Inc.*, 135 B.R. 149 (Bankr. M.D.Fla.1991); *In re U.L. Radio Corp.*, 19 B.R. 537 (Bankr.S.D.N.Y.1982); *In re Bronx–Westchester Mack Corp.*, 20 B.R. 139 (Bankr.S.D.N.Y. 1982); *In re Varisco*, 16 B.R. 634 (Bankr. M.D.Fla.1981); *In re Rooster, Inc.*, 100 B.R. 228 (Bankr.E.D.Pa.1989).

another to some extent, they are alike in that they focus not on whether the lessor's decision to withhold consent is correct, but on whether there is a substantial basis for the lessor's decision under relevant criteria. None of the authorities suggest that a court is to review the lessor's refusal to consent *de novo* and find that decision is unreasonable because the court would have decided differently. The quotation from the *Grossmann* [*v. Barney*] decision [359 S.W.2d. 475 (Tex.Civ.App.1962)] expressly states that withholding consent may be reasonable even if the decision is wrong. The quotation from the *Thurman* [*v. Meridian Mut. Ins. Co.*] decision [345 S.W.2d 635, 639 (Ky.1961)] states that withholding consent is reasonable if, on the facts of the case, reasonable minds could differ as to whether consent should be withheld.

*Id.* at 548. Because an automobile dealership involves a closer relationship between the parties than the typical lease, and because it is more difficult to determine whether a proposed franchisee is capable of performing the duties of an automobile dealer, the court concluded that a manufacturer's refusal to consent to assignment of its automobile franchise should be afforded even greater deference than is commonly granted lessors in deciding to withhold consent. *Id.*

The court described the standard of reasonableness that it was adopting as follows:

I conclude that withholding of consent to an assignment of an automobile franchise is reasonable under California Vehicle Code section 11713.3(e) if it is supported by substantial evidence showing that the proposed assignee is materially deficient with respect to one or more appropriate, performance-related criteria.[7] This test is more exacting than whether the manufacturer subjectively made the decision in good faith after considering appropriate criteria. It is an objective test that re-

quires the decision to be supported by evidence. The test is less exacting than one which requires that the manufacturer demonstrate by a preponderance of the evidence that the proposed assignee is deficient. Although the initial burden of explaining the basis for the decision is on the manufacturer, the ultimate burden of persuasion is on the assigning dealer to demonstrate that the manufacturer's refusal to consent is unreasonable.

*Id.* at 549.

Ford contends that the standard applied by the *Van Ness* court is not sufficiently deferential to manufacturers. It argues that unreasonable means "irrational, foolish, unwise, absurd, silly, preposterous, senseless, and stupid." *Van Ness* at 548, citing *Mitchell's Inc. v. Nelms*, 454 S.W.2d 809 (Tex.Civ. App.1970). Ford suggests that its refusal to consent should be upheld if it "acted for a valid business reason," *Perez v. Jefferson Standard Life Ins. Co.*, 781 F.2d 475, 480 (5th Cir.1986), and argues that the appropriate standard is "something more than arbitrary and capricious and something less than supported by substantial evidence." *Harper v. United States*, 769 F.Supp. 362, 366 (M.D.Fla.1991).

The standard of reasonableness elaborated in *Van Ness* is an appropriate one, and to the extent the bankruptcy court adopted that standard, this Court agrees with that decision. *Harper* is a case considering the ability of the Internal Revenue Service to make jeopardy assessments against taxpayers, a situation which is in no way analogous to a manufacturer's decision to withhold consent to the assignment of a franchise agreement. Ford's arguments for the very high degree of deference to manufacturers' refusals of consent to transfer franchise agreements fail to take into account that Cal. Veh.Code § 11713.3(e) also has as a purpose the protection of the franchisee.[8] The standard

---

7. Relevant considerations include: (1) whether the proposed dealer has adequate working capital; (2) the extent of prior experience of the proposed dealer; (3) whether the proposed dealer has been profitable in the past; (4) the location of the proposed dealer; (5) the prior sales performance of the proposed dealer; (6) the business acumen of the proposed dealer;

(7) the suitability of combining the franchise in question with other franchises at the same location; and (8) whether the proposed dealer provides the manufacturer sufficient information regarding its qualifications.
*Van Ness,* 120 B.R. at 547.

8. It is unlawful and a violation of this code for any manufacturer, manufacturer branch,

adopted by the *Van Ness* court strikes an appropriate balance between the interests of the manufacturer and the interests of the franchisee.

### C. Application of the *Van Ness* Standard to the Facts of This Case

In its June 1, 1995 Findings and Conclusions, the bankruptcy court found that

> The Debtor and Worthington have proven by a preponderance of the evidence that it is unreasonable for Ford, GMC and Isuzu to withhold their consent to the assumption and assignment of the Franchise Agreements to Worthington, viewing all evidence presented by all parties. The evidence presented by the franchisors to justify their refusals to consent to transfer of the franchises to Worthington is not substantial evidence that Worthington is materially deficient with respect to one or more relevant criteria. The evidence presented by debtors and Worthington rebutted and overcame the evidence presented by the franchisors, so that viewing all the evidence movants met the standard of proving by a preponderance that the manufacturers['] refusal to consent to Worthington was unreasonable.

Findings and Conclusions, ¶ 14.

#### 1. GM's refusal to consent to the assignment to Worthington

■ GM argues that the bankruptcy court erred by determining that GM had not presented "substantial evidence" to justify its refusal to consent to transfer and by improperly balancing the evidence to conclude that Worthington's evidence "rebutted and overcame" GM's evidence. This Court agrees and, accordingly, reverses the order compelling transfer of the franchise agreements as to GM.

GM presented evidence that Worthington had received seriously deficient Customer Satisfaction Index ("CSI") ratings at his Chevrolet dealerships in Sacramento, California, Houston, Texas and Cupertino, California. As of February 1995, Worthington's Sacramento Chevrolet dealership's 12 month rating was 73, compared to a regional average of 86 and nationwide average of 88. Worthington Chevrolet ranked 87th out of 88 dealerships in his Marketing Sales and Service Area ("MSSA"), and 4401 out of 4428 dealers nationwide. GM's evidence showed that the Sacramento dealership's CSI ratings declined from 1992 to 1994. GM also presented evidence of poor CSI ratings at the Houston and Cupertino dealerships, which Worthington no longer owns. In 1991, the last full year Worthington owned the Houston dealership, its CSI rating was 72, 14 points below the MSSA average of 86, ranking Worthington Chevrolet 53 out of 56 dealerships in the MSSA.

The bankruptcy court found that

> Worthington's poor Customer Satisfaction Index ratings ("CSI") relating to three Chevrolet dealerships owned and operated by Worthington do not constitute a reasonable basis, alone or in conjunction with any other factors cited by Ford, GMC or Isuzu, for their refusal to consent to the assumption and assignment of their respective Franchise Agreements to Worthington. Worthington's rating under the PDS System which is being substituted by GMC for the CSI rating system is better than Worthington's CSI rating. Worthington has entered into an agreement with Caren Myers to become the general manager for the Cadillac and Pontiac–GMC Truck franchises being acquired by Worthington. Myers will obtain an equity interest in Worthington's Cadillac dealership. Myers successfully operated the Pontiac and Cadillac franchises at the Claremont location when they were owned by a prior owner. Myers has extraordinarily good CSI ratings with GMC in connection with the Cad-

---

distributor, distributor branch licensed under this code to do any of the following:

. . . . .

To prevent, or attempt to prevent, a dealer from receiving fair and reasonable compensation for the value of the franchised business.

Cal.Veh.Code § 11713.3(e).

illac dealership which she is currently managing.

Findings and Conclusions ¶ 16.

This finding demonstrates that the bankruptcy court improperly balanced evidence presented by Worthington against the evidence presented by GM. While recognizing that GM had presented evidence of very low CSI ratings, the bankruptcy court discounted the importance of this evidence by pointing out a recent improvement over a three month period at the Worthington Chevrolet dealership in Sacramento under a new rating system, "PDS," and by pointing out that Worthington had entered into an agreement with a very successful manager of Cadillac dealerships, Caren Myers ("Myers"), to manage the Claremont Cadillac and Pontiac/GMC Truck dealerships. The bankruptcy court did not limit itself to the question of whether the CSI evidence presented by GM was "substantial," but went on to determine that a recent upward trend in customer satisfaction under the new PDS system and the hiring of Caren Myers "rebutted and overcame" GM's evidence. This was an improper application of the legal standard discussed in *Van Ness.* The bankruptcy court required more than "substantial evidence" and, in effect, placed upon the manufacturer the burden of proving that Worthington was deficient as a proposed assignee, an approach rejected by the *Van Ness* court. 120 B.R. at 549.

The finding that GM had not presented substantial evidence that Worthington is materially deficient in one or more performance related criteria is clearly erroneous. The *Van Ness* court stressed the importance of customer satisfaction and concluded that

> It is not beyond the realm of reasonable decisions for a manufacturer of luxury cars to refuse to accept a dealer with CSI rank-

ings that are average at best and possible well-below average.

120 B.R. at 550.[9] Here, there is no question that Worthington's CSI ratings are far below average; the Sacramento dealership is in the bottom 1% of Chevrolet dealerships nationwide. GM's refusal to transfer a franchise for its luxury line, Cadillac, is not unreasonable given the undisputed CSI evidence.

That Worthington and his proposed manager, Myers, have positive attributes is also not seriously in dispute. Worthington has had a long career in the automobile business, and has sold a large number of cars over the years. Also, Myers has been a very successful manager and has achieved high CSI ratings at the Cadillac dealership she currently manages. However, these positive attributes do not change the fact that GM has shown Worthington to be materially deficient in his CSI ratings. Reasonable minds might differ as to whether GM should have withheld consent, but the decision was based on substantial evidence and the court should not substitute its judgment for that of the manufacturer.[10]

### 2. Ford's refusal to consent to the assignment to Worthington

■ Ford contends that it also presented substantial evidence to support its decision to refuse to consent to transfer of the Ford franchise to Worthington. Like GM, Ford argues that the bankruptcy court applied the incorrect legal standard by improperly balancing the evidence offered by Ford and Worthington regarding his qualifications. Ford's position is that regardless of whether the bankruptcy court improperly balanced the evidence, the court's finding that Ford had not presented substantial evidence was clearly erroneous.

**9.** *See Bill Call Ford, Inc. v. Ford Motor Co.,* 48 F.3d 201, 203 (6th Cir.1995) (not unreasonable for manufacturer to condition transfer on assignees ability to meet CSI targets).

**10.** GM argues that Worthington was deficient in several other performance related criteria as well. GM argues that the bankruptcy court did not properly consider evidence that Worthington was deficient with regard to sales and profit history, working capital, existence of consent decrees related to sales and advertising practices, and his failure to provide all requested information in connection with his application to take over the Claremont Cadillac and Pontiac/GMC Truck dealerships. Some of these alleged deficiencies were disputed by Worthington, especially the question of whether his Sacramento Chevrolet dealership was undercapitalized, and the bankruptcy court apparently found that the other alleged deficiencies were not material. This finding is not clearly erroneous.

Ford's evidence supporting its decision to refuse to consent to the assignment is found in the declaration of Richard L. Basile, Jr. ("Basile"), Regional Market Representation Manager for the Los Angeles Region of Ford. In evaluating dealer candidates, Ford considers four criteria: (1) Capital; (2) Character, focusing on the candidate's standing in the community and personal and financial reputation; (3) Capacity, meaning sales performance and management skills; and (4) Customer Satisfaction. Evaluating Worthington's application, Ford concluded that Worthington was deficient with regard to three of the four "Cs": character, capacity and customer satisfaction.

Ford determined that Worthington was deficient in character due to four consent decrees which Worthington entered into between 1979 and 1986. The bankruptcy court found that Ford's reliance on this criteria was unreasonable:

> The existence of consent decrees and a Federal Trade Commission order involving Worthington owned and operated dealerships during the period between 1979 and 1985 did not create a reasonable basis, alone or in conjunction with other factors cited by Ford, GMC or Isuzu, for their refusal to consent to the assumption and assignment of their respective Franchise Agreements to Worthington. The consent decrees and Federal Trade Commission order did not involve any findings of fraud. Worthington was awarded twelve dealerships after the issuance of the consent decrees and Federal Trade Commission order, three of which were awarded by GMC and one of which was awarded by Ford.

Findings and Conclusions, ¶ 15. This finding is not clearly erroneous. The fact that the consent decrees did not involve findings of fraud and that Worthington had been awarded numerous dealerships after the consent decrees had been entered into provides ample basis for the conclusion that Ford was unreasonable in relying on deficiencies in Worthington's character as a basis for refus-

ing to consent to the transfer of the franchise agreement.

With regard to capacity, Ford determined that Worthington was deficient based on what Ford regarded as insufficient sales performance. Ford pointed to below average market share performance, which is calculated by comparing the dealer's sales to the percentage of vehicles registered in the region which were sold by Ford. Thus, if Ford sells 10% of the vehicles in the dealer's region, that dealer is expected to sell at least 10% of the vehicles in his or her primary market area. Ford's position is that sales performance less than 100% of the regional average is unacceptable. Ford presented evidence that Worthington Ford Long Beach was 79.4% of regional average on retail car performance and 86.3% on retail truck performance. With regard to Worthington Ford in Anchorage, Alaska, the market performance was 87.4% of the Seattle regional average on retail car performance and 115.3% of average on retail truck performance. Ford, however, says that these numbers are inaccurate as they give Worthington Ford, the only Ford dealer in Anchorage, credit for all Ford registrations in the area, even when the car or truck was not actually sold by Worthington. Considering registrations from Worthington Ford alone, market performance is 82.2% on retail car performance and 67.3% on trucks.

Worthington disputes both the accuracy and importance of these figures. As to the Anchorage dealership, Worthington presented evidence that the market share numbers are distorted because Ford automobiles enter that market from various sources not considered by Ford in calculating Worthington's market performance. Worthington presented evidence that Ford allows a Lincoln Mercury dealership in Anchorage to purchase Fords from dealers in other states and sell them in Alaska and that various car rental companies also sell Fords in the area. Worthington also presented evidence that he had won numerous sales awards for his Ford dealerships' performance.[11]

11.    Worthington has consistently been ranked among the top 100 dealers nationally among Ford dealers in sales. Worthington has

regularly won the Ford "Super Bowl" competition for his Ford dealerships both in Anchorage, Alaska and Long Beach, California. With

The bankruptcy court apparently determined that the regional average comparison was an inappropriate measure of sales performance and that it was unreasonable for Ford to rely on this figure as the exclusive measure of sales performance. Other courts have considered factors which might depress a dealer's sales performance when measured in comparison to a regional average and have held that a manufacturer's refusal to consent to transfer on this basis to be unreasonable, when the regional average comparison is misleading. In *Key v. Chrysler Motors Corp.*, 119 N.M. 267, 889 P.2d 875 (N.M.Ct.App. 1995), the trial court determined that the proximity of the franchise in question to other dealerships in a separate marketing region made the comparison to the regional average an inaccurate measure of sales performance and found that it was unreasonable for Chrysler to rely on this factor in refusing to consent to the assignment of the franchise. In *Marquis v. Chrysler Corp.*, 577 F.2d 624 (9th Cir.1978), the Ninth Circuit held that failure to meet regional average sales alone was not sufficient grounds for termination of a dealer's franchise agreement.[12] "The nature of [a regional average comparison] renders it suspect as the single indicator of satisfactory sales performance." *Id.* at 632. Given that numerous dealers will by definition be below average, allowing manufacturers to rely heavily on a regional average comparison as the sole measure of sales performance would give them too great an opportunity to terminate dealerships or refuse to consent to the transfer of franchises to qualified candidates.

It was not an impermissible weighing of the evidence for the bankruptcy court to reject Ford's reliance on a regional average comparison as the sole measure of sales performance. Given the recognized difficulties with such a measure and the evidence regarding the nature of the market in Anchorage, it was not clearly erroneous for the bankruptcy court to conclude that Ford was

being unreasonable in refusing to consent to transfer based on a failure to make sales at or above the regional average.

With regard to customer satisfaction, Ford admits that Worthington Long Beach is "marginally acceptable" and that Worthington Anchorage is "acceptable." However, Ford still found Worthington unacceptable based on the customer satisfaction ratings of Worthington Dodge in Carlsbad, California and Worthington Chevrolet in Sacramento. It was not error for the bankruptcy court to reject Ford's reliance on the experience of other manufacturers in refusing to consent to Worthington. Given Worthington's demonstrated ability to satisfy Ford customers, his difficulty satisfying Dodge or Chevrolet customers is not a relevant criteria.

■ Although the bankruptcy court found that Worthington's evidence "rebutted and overcame" Ford's evidence, there was not an improper balancing of the evidence in the case of Ford. A manufacturer cannot rely on unreasonable criteria in rejecting a proposed assignee. When a manufacturer's evidence is shown to relate to unreasonable criteria or is shown to be inaccurate, it is properly rejected. This is the case with Ford's evidence regarding the deficiencies of Worthington. The bankruptcy court did not err in finding that Ford had not presented substantial evidence to support its refusal to consent to the transfer of the franchise agreement to Worthington.

**D. Applicability of 11 U.S.C. § 365(b)(2)(D)**

■ On or about November 7, 1994, Debtors ceased operating the automobile dealerships. The bankruptcy cases were not filed until November 20, 1994. The franchise agreements provide that the manufacturer may terminate the franchise for failure to operate the business for seven consecutive business days. Ford and GM argue that the debtors' failure to operate the franchises con-

---

regard to the Anchorage dealership, Worthington has ranked first in sales volume of all dealers in the state of Alaska and has consistently won sales contests based on sales volume.
Findings and Conclusions, ¶ 26.

12. Over an eight year period, the dealer in *Marquis* had attained the regional average in only one year, and in the remaining years his sales were 50–80% of the regional average.

stitutes an incurable default, rendering the franchises non-assignable.

The bankruptcy court held that § 365(b)(2)(D) relieved the debtor from the obligation of curing the default. This section provides:

Paragraph (1) of this subsection [imposing the requirement of curing defaults prior to assumption and assignment] does not apply to a default that is a breach of a provision relating to—

.        .        .        .        .

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform non-monetary obligations under the executory contract or unexpired lease.

11 U.S.C. § 365(b)(2)(D). The bankruptcy court held that the failure to operate the dealerships was a nonmonetary default which, according to § 365(b)(2)(D), did not have to be cured before the franchise agreements could be assumed and assigned. This Court agrees with the bankruptcy court's interpretation and, accordingly, affirms with regard to this issue.

■ Ford and GM argue that subsection (b)(2)(D) refers only to the payment of penalties that a debtor would be required to pay as a result of a pre-petition breach. The plain language of the statute does not support this construction. The statute refers to a "penalty rate *or* provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract...." The most natural reading of this language supports the interpretation given it by the bankruptcy court—that a trustee or debtor in possession is not required to cure nonmonetary defaults in order to assume and assign executory contracts and leases.

■ GM and Ford argue that this plain interpretation of the language should not be followed as it works a "radical" change in the law and that Congress did not intend such a radical change. In support of

their position, the manufacturers argue that the legislative history suggests a more narrow purpose for the amendment to § 365(b):

Finally, section 365(b) is *clarified* to provide that when sought be a debtor, a lease can be cured at a nondefault rate (*i.e.*, it would not need to pay penalty rates).

5 U.S. Congressional and Administrative News at p. 3359 (1994) (House Report No. 103–835, § 220 of the Bankruptcy Reform Act) (parenthetical in original) (emphasis added). From this legislative history the manufacturers argue that the only Congressional purpose in enacting § 365(b)(2)(D) was to relieve the trustee or debtor in possession from any requirement of paying penalties prior to assumption of the executory contract or lease. This resort to legislative history is insufficient to defeat the expression of intent found in the plain language of the statute.

[I]n rare cases the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters, and those intentions must be controlling. We have reserved "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning ... would thwart the obvious purpose of the statute.'" *Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (quoting *Helvering v. Hammel*, 311 U.S. 504, 510–511, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941).

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). GM and Ford have not demonstrated that the interpretation of § 365(b)(2)(D) as eliminating the requirement of curing nonmonetary defaults prior to assumption and assignment is "demonstrably at odds" with the intentions of the drafters or that it "thwarts the obvious purpose of the statute." The obvious purpose of § 365(b)(2)(D) was to make it easier to cure certain defaults, and the bankruptcy court's interpretation of the statute is consistent with that purpose.[13]

13. Ford argues in addition that application of § 365(b)(2)(D) to this case is an impermissible retrospective application of the statute. However, section 702 of the Reform Act clearly provided that the amendments would be applicable to bankruptcy cases filed after October 22, 1994. As these bankruptcy cases were filed after that date, § 365(b)(2)(D) applies. Further, applica-

For the foregoing reasons, the bankruptcy court's order compelling assignment of the Cadillac and Pontiac/GMC Truck franchise is reversed and the order compelling assignment of the Ford franchise is affirmed.

tion of this statute to these franchise agreements does not affect property rights of the type at issue in *United States v. Security Indus. Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) and the fact that the provision affects existing contractual rights does not render it invalid. *Id.,* 459 U.S. at 80, 103 S.Ct. at 413.